EDWARD W. SPARROW v. COMMISSIONER OF THE STATE LAND OFFICE.

<table>
<tr><td>56</td><td>567.</td></tr>
<tr><td>65</td><td>30</td></tr>
<tr><td>56</td><td>567</td></tr>
<tr><td>89</td><td>265</td></tr>
<tr><td>89</td><td>272</td></tr>
<tr><td>56</td><td>567</td></tr>
<tr><td>120</td><td>562</td></tr>
<tr><td>120</td><td>566</td></tr>
<tr><td>56</td><td>567</td></tr>
<tr><td>f148</td><td>¹ 99</td></tr>
<tr><td>j148</td><td>130</td></tr>
</table>

*Internal improvements—Appropriation of swamp lands.*

1. The constitutional provision forbidding the State to engage in works of internal improvement (Mich. Const. art. xiv., § 9) does not invalidate Act 130 of 1883, in so far as it provides that swamp lands belonging to the State be appropriated to a particular county to aid in improving the channel of a designated stream, reclaiming adjacent lands, and improving their sanitary condition.

2. Act 130 of 1883, appropriating lands to pay the expense of an internal improvement, authorized the imposition of a tax in addition. *Held,*

that the tax-provision did not invalidate the appropriation so long as it was not the consideration therefor.

3. The principles of local self-government are not infringed by leaving it to a State officer to supervise the appropriation of State lands to a local improvement.

Mandamus. Submitted April 14. Granted May 6.

*Albert Dodge* and *L. S. Montague* for relator.

The Attorney General for the respondent.

COOLEY, C. J. The Legislature of the State at its session in 1883 passed an act "to provide for straightening and opening the channel of Cedar river and its east and west branches, and making an appropriation of State swamp lands to aid the work, and to authorize the levying of a tax for the completion of the same," etc. Pub. Acts, 133.

The first section provided that "for the purpose of aiding in straightening the channel of the Cedar river and its east and west branches, and opening, widening and deepening the same, to the end that the large territory now periodically submerged may be reclaimed, and the sanitary condition of the adjacent lands improved, there shall be, and hereby is, appropriated to the county of Livingston ten thousand acres of swamp lands in the lower peninsula not otherwise appropriated."

The second section directed that the lands when selected should be withheld from sale during the time fixed by the act for the completion of the work, and that when the commissioner should certify that one-half the work was completed, one-half the lands should be patented to the county, its assigns or the contractor, and the remainder upon a like certificate of the entire completion of the work.

The third section named Spiridon S. Abbott as commissioner under the act, and directed that he give bond in the sum of $30,000 for the faithful performance of his duties as such.

By the fourth section the commissioner was to proceed at once to prepare plans and specifications for the work in

the townships of Conway, Handy, and Iosco, in Livingston county, and of Locke, Leroy, and Williamstown, in Ingham county, or in so many of the towns as he might find necessary, and to submit the same to the board of review, provided for in a subsequent section.

By the fifth section provision was made for procuring the right of way for the improvement. No question arises upon that in this case.

The sixth section provided that "the cost of constructing said improvement, together with the expenses incident thereto in excess of the appropriation hereby made, shall be paid by the lands and property benefited thereby, and by any township, city, or village, by reason of the benefit to the public health, and as a means of improving any public highway," and the commissioner was empowered to lay an assessment on the lands benefited for the excess in cost above the appropriation.

Section seven provided that on the completion of the assessment the commissioner should advertise for letting a contract for the work to the lowest bidder, and for making the contract and taking bond for security.

By section eight provision was made for the collection of the assessments by the township collectors, and the moneys when collected were to be held, subject to the order of the commissioner, for the payment of the contract and other expenses pertaining to the improvement.

Section nine declared that the supervisors of the several townships named should, together with the commissioner, constitute a board of review; and section ten made provision for the return of unpaid taxes.

Section eleven required the improvement to be completed within five years from the passage of the act, and gave direction for settlement by the Commissioner of the State Land-office with the special commissioner, and for cancelment of his bond.

The act was declared to have "passed the senate and house by a two-thirds vote of all the members elect of each house respectively, and ordered to take immediate effect."

The special commissioner immediately gave bond under the act and proceeded to the performance of his duties. On July 19, 1883, he made certificate in writing of his determination "that the proposed improvement was necessary and for the good of the public health, and as a means of improving the public highways," and ought to be constructed. A survey, with plans and specifications, was duly made and completed, and was submitted to the board of review and duly approved. The commissioner then went on to obtain releases of the right of way for the improvement, and succeeded except in a few instances where lands were owned by minors. As to such minors, proceedings to appropriate a right of way as for a public use were taken, upon which no question is made now.

The commissioner then proceeded to make an assessment of benefits as contemplated by the act, and the assessment was laid before the board of review, and approved by the board, with some changes, after hearing the parties complaining thereof.

On September 3, 1884, the commissioner advertised for letting a contract for the construction of the work, and on October 4, 1884, in pursuance of the advertisement, he received and examined the bids. That of Edward W. Sparrow, who proposed to construct the work for $12,600, in addition to the land appropriated, was the lowest bid, and was accepted, and a contract entered into with him. The commissioner then made an assessment upon the lands benefited for this sum and for the other estimated expenses, which increased the total to $15,000. The whole sum thus assessed, with the exception of about $500, was voluntarily paid by the parties assessed.

Sparrow, as contractor, immediately proceeded in the construction of said improvement, and became assignee of the county of Livingston of the right to the lands appropriated therefor. On March 19, 1885, after a considerable proportion of the work had been done, he applied, as such contractor and assignee, to the Commissioner of the State Land-office to have certain designated State swamp lands reserved for sale, according to the provisions of

said act. The commissioner, in view of doubts which had been suggested of the constitutionality of the act, declined to make the reservation, and Sparrow thereupon applied for this remedy. The commissioner has answered the application, and submitted the facts to the Court for its decision. It is not questioned in the answer that the terms of the act have been so far complied with that the relator is entitled to the relief he seeks if the act itself is valid.

The grounds of supposed invalidity which are advanced in the brief of the Attorney General are—*first*, that the act contemplates a scheme of internal improvement not permitted by the Constitution ; *second*, that it is an encroachment upon the constitutional right to local self-government; and, *third*,—which is perhaps embraced in the other two,—that it provides for an inadmissible scheme of taxation. Upon these, so far as necessary, I shall briefly present my views.

The Constitution provides that " The State shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property." Article 14, § 9. This provision is supposed to be violated by the act under consideration, and the case of *Anderson v. Hill* 54 Mich. 477 is relied upon in support of that view.

The case referred to arose under "an act to provide for the straightening and otherwise deepening the channel of the Dowagiac river in Van Buren County," approved March 17, 1881. Local Acts 1881, p. 110. That act undertook to empower the legal voters of the townships of Decatur and Hamilton to determine by a majority vote whether a tax should be levied on their townships respectively in aid of the improvement mentioned in the title of the act ; the money, if voted, to be "assessed and collected in the same manner as other township taxes are, and expended in connection with other funds and means donated to and provided for such river improvement, after a full investigation of its merits under the supervision of the State board of control of State swamp lands." It appeared in the case of

*Anderson v. Hill* that an appropriation of State swamp lands had been made for the improvement, and that one of the townships had voted a tax, the avails of which were to be paid over to a person with whom a contract had been made for the construction of the work. The plaintiff was a taxpayer in the township, who, having paid the tax under protest, brought suit to recover back the amount paid. The only question involved in the case was whether the tax was legal.

It was conceded in that case that the State had authority to make an appropriation of swamp lands for the purposes of the improvement, and that the contract which had been made was a competent one for the State to enter into. The work was spoken of as one of internal improvement, but the lands had been donated to the State to be made use of for the purposes of drainage and reclamation (9 Stat. at Large 519), and making use of them for the purpose expressed in the act was entirely in the line of the donation. The tax levied upon the townships was, however, held invalid in that case.

In this case the tax is not in question. It is incidentally stated, though the statement has no relevancy to the relief asked, that nearly all the persons taxed have voluntarily paid the sums assessed upon them. Persons have an undoubted right in any case, where the State is making a donation of State lands, to give their money in aid of the purpose of the State donation ; and it is immaterial in the case that they make the gift in the form of taxes. Their giving or with-holding does not in any way affect the right or power of the State to make donation of the lands.

It was suggested on the argument that if that part of the act which concerns the tax is void, the whole act must fail. That might be so, perhaps, if the tax were to be the consideration to the State for the donation of lands ; but this is not the case. The tax, if paid, goes to the contractor, and it goes in furtherance of the purpose for which the donation is made. The State is willing to make a certain donation for a specified improvement ; but it is supposed a further inducement to a contractor is essential, and to furnish such further inducement the tax is laid. But

the willingness of the State to make the donation does not at all depend upon the local community paying a tax. It depends upon the improvement being made; and if the people secure the improvement by a voluntary payment of money, the will of the State would be defeated, and at the same time gross injustice done if the lands are then withheld from the contractor.

I do not intend by this decision to raise any question of the correctness of the decision in *Ryerson v. Utley* 16 Mich. 269 and *Hubbard v. Township Board of Springwells* 25 Mich. 153, or of any of the cases in which the right of the people to local self-government has been vindicated. Putting out of question now the tax, which is in no way involved here, it is plain that the State has done nothing in restriction of the right to local government, what it has done being a favor to the local community, though worked out through State agencies; and the donation of lands is not only in harmony with the act of Congress under which the lands are held, but it is in general accord with the practice of the State, which has prevailed for more than thirty years, to have these lands appropriated, under the general supervision of a State officer,—a practice never before, so far as I know, questioned on constitutional grounds.

The Commissioner should reserve the lands as prayed.

SHERWOOD, J. concurred.

CHAMPLIN, J. The Constitution does not prohibit the State from donating lands belonging to her to aid internal improvements, but expressly permits such action. I see no constitutional objections to sections 1 and 2 of the act in question, which clearly and unequivocally donates ten thousand acres of land to aid the improvement named. The act also contains provisions for protecting the State from imposition, by providing that the land shall not be patented until after the improvement is made; one half when the work is half completed, and the balance when the whole work is done. The relator shows that the conditions under which the lands were donated have

been complied with, and so far as the State is concerned he is entitled to the lands applied for. While I agree with my brother Campbell that the act under which the improvement is made, is subject to grave objections on constitutional grounds which he has pointed out, and which I should feel it my duty to consider if complaint was brought before us on behalf of any person aggrieved, yet I do not think the Commissioner is in a position to raise the objection on constitutional grounds. The State has by the act in question donated the lands, which she had a legal right to do to aid the improvement; the conditions have been complied with by the contractor, and it seems to me that it would be an act of injustice if the State should now refuse to carry out such provisions of the law as are legal and valid, by selecting and patenting the lands according to the provisions of the act. The Legislature, acting in behalf of the State, has not repealed the grant, and I can see no propriety in refusing to give it effect according to the manifest intent of the Legislature.

I think the writ should issue.

CAMPBELL, J.  Relator asks a mandamus to compel the Land Commissioner to transfer to him certain swamp lands under an appropriation made by act No. 130 of the statutes of 1883, for straightening and opening the channel of Cedar river and its east and west branches in Livingston and Ingham counties. Respondent declines to do so, on the ground that by our previous decisions such a statute as this appears to be is unconstitutional. No question is presented concerning relator's right as assignee of Livingston county to have what he asks if the statute is valid. The Constitution declares, by section 9 of article 14, that "The State shall not be a party to or interested in any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property." It is claimed that this is a work of internal improvement carried on by the State, and not confined to the expenditure of grants to the State of land or other property.

There can be no doubt of its being a work of internal im-

provement.    That phrase is as broad as language can make it.
It can make no difference for what direct or indirect purpose
of public utility an improvement is made so long as it comes
within such a definition, and it can make  no legal difference
over how much of the State it passes.    All works of conven-
ience, whether for travel, drainage or irrigation, are similar
in their nature when small and  large, and works for all of
these purposes have been made of all dimensions, and for
large and small districts.    It is impossible to draw any line
of magnitude.    Any such work. that is deemed important
enough for the State to construct is within the rule, and if
not built in the permitted way, is within the prohibition.
The present work affects several townships and two counties,
and is declared by the statute itself as intended to reclaim a
"large territory now periodically submerged."

The cases which we have decided illustrate this principle.
In *Ryerson v. Utley* 16  Mich. 269, the improvement passed
upon was the improvement of navigation over the sand-flats
of Muskegon river, which the State undertook to build, and
did provide for building, out of a proper fund that turned
out to have no existence, and we held there was no authority
to raise funds by tolls or in any way not mentioned in the
Constitution to pay for it.    In *Hubbard v. Springwells* 25
Mich. 153, the road provided for was a short one of but a
few miles in one township, for which the State required town-
ship bonds to be issued  and taxes to be levied to pay the
interest by assessment on the township, and taxes to pay the
principal by assessment on neighboring lands, while the road
was to be kept in repair by tolls, and if necessary by taxes.
In *Anderson v. Hill* 54 Mich. 477, the improvement in-
volved was that of deepening and straightening the channel
of Dowagiac river, for the same general purposes contempla-
ted in the Act before us.    At first it was intended to make
the entire improvement out of swamp lands, but it was sub-
sequently attempted, under State management, to complete
the work by local taxation, and it was held that this could
not be done, because the work was made a State work.

The question  therefore arises whether  the present work

comes within the same category, as a State work not to be entirely carried out by lands or property granted to the State.

The statute upon its face indicates that the work is not expected to be completed by the ten thousand acres of swamp lands granted to Livingston county for that purpose. The commissioner to superintend the work is appointed by name in the act, and his successor, if any, was to be appointed by the Governor. He was empowered to make the proper plans and specifications for straightening, opening, widening, and deepening the Cedar river in the six townships named, three of which were in each county, " or in so many of said towns as he may find necessary," and on their completion to submit them to a board of review, provided for, which was to consist of the supervisors of the six townships named, over whom he was to preside, and empowered to vote when their vote should be tied. Upon the approval of his plans, which were to be as extensive as he should choose to make them, the commissioner was empowered to procure releases of right of way, or to procure condemnation under proceedings in accordance with the drain laws, and to take land without either release or condemnation if within the meander lines of the government survey. He was required, after getting the way, to advertise for letting the contract to the bidder who would do the work for the smallest sum in money in addition to the land appropriation, and to assess in one roll the cost of construction, and the expenses of locating and establishing the same, including his own compensation at three dollars a day, and the damages and incidentals in a gross sum, and then to apportion the whole upon what he should deem the lands and property benefited at a valuation fixed by himself in the first instance, fixing the amount chargeable on any township, city, or village as a municipality benefited in gross, and on individuals benefited separately. This assessment was to be reviewed by the same board, and on completion was to be divided into six rolls, one for each township, to be collected with the annual assessment rolls, and in the same way, and the money to be paid over to the commissioner for disbursement. Unpaid taxes were to be returned and lands sold as

in other cases.   The several supervisors were to be paid two dollars a day, to be audited by their respective town boards as township charges.

It is impossible to treat this as anything but a State transaction.   The commissioner, who controls the proceeding throughout, is a State officer, whose bond is fixed by statute at $30,000, and, although given nominally to the county of Livingston, is to be approved by the Land Commissioner. Although it is not said in the outset expressly where it is to be filed, yet section eleven provides for a report from him to the Land Commissioner of all his doings, and a cancellation and surrender of the bond by the latter, if satisfied that the duties have been properly done and the money faithfully disbursed, and a suit on the bond of the Land Commissioner for any default.   The county of Livingston has not, neither have any of its agencies, from first to last, any action to take or any rights or interests to enjoy.   How the county came to be named at all can only be inferred from a probable enlargement and change in the scope of the statute from its first purpose before enactment.

The board of review consists of three supervisors from each county, in no way representing the county or their own towns for any county or township purpose.   They are selected for a new, single, and special purpose.   The townships as such have nothing to do with assessments or taxes, except to collect them and to pay them, not into the township treasury for township purposes, but to the statutory commissioner.   There is no duty laid on any one except as ancillary to the action of the State agent.   The case is in this respect stronger than that of *Hubbard v. Springwells*, where there were some subordinate functions performed by town officers, and that of *Anderson v. Hill*, where the tax was left optional with the voters of the townships concerned. Here neither township nor county authorities, nor people, in any known, direct, or representative way, have any control in the matter.

It is also plain that the improvement was to be and has been constructed in chief by funds raised by taxation.   It

was urged on the argument that this objection is not valid unless made by the tax-payers. But it is evident from the Constitution, and is known to every one in fact, that the chief object of the prohibition was to protect the State itself and its interests from such complications. There are many considerations outside of the mere money question. It is for the interest of every citizen that the State shall confine itself to its own functions. Every thing looking like intermeddling in local affairs or in business enterprises or improvements has either been positively forbidden or jealously guarded. The credit and prosperity of the State were impaired and nearly ruined by a wild system of enterprises in which every portion of the State was anxious to have its share, and many persons found profit and influence in official jobs. The prohibition of such things altogether was found easier than any discretionary and discriminating power, however limited, and the courts cannot recognize what is forbidden to the Legislature. It cannot be held that money raised by taxation can be treated as a grant of money within the Constitution, and moreover, although the balance unpaid is not very large, there is still some balance unpaid, and there are some rights which have been taken without release which have to be taken into the account.

· But beyond that it is clear that if an act is void as unconstitutional in its provisions as beyond legislative power when passed, it cannot be made valid by either private or legislative action by way of confirmation. It was held in *Fenn v. Kinsey* 45 Mich. 446 that a void act cannot bind the State by way of estoppel any more than in any other way, and that an authorized grant could not attach to a title subsequently released to the State unconditionally, without new action. This statute contains upon its face the evidences of its own illegality, as beyond the power of any State authority, and cannot bind the State any more than it can bind private interests.

The two-thirds legislative vote necessary to authorize the appropriation of public property to local purposes (Art. 4, § 45), while it would have sanctioned the use of swamp lands

granted in aid of local enterprises in lawful, hands cannot do so where they are carried on by the State. There is no provision which would justify this.

In my opinion the Commissioner of the Land Office was right in declining relator's application, and no mandamus should issue.