THE ATTORNEY GENERAL, FOR AND IN BEHALF OF THE PEOPLE, v. CHARLES F. RUGGLES.

*Agricultural college lands—Fraudulent purchase—Evidence of fraud— Settlement.*

A party applied to the Commissioner of the State Land Office to purchase certain agricultural college lands, for sale under the statute for not less than three dollars per acre, payable one-fourth down and the balance at the option of the purchaser. The statute further provided "that all of said lands which were valuable principally for the timber thereon, should be sold for not less than five dollars per acre, payable at date of purchase." No estimate was made of the value of said timber, and in selling the commissioner had to rely upon the statements of the purchasers, or upon affidavits filed, presumably in their interest; and this had been the practice of the commissioner, acquiesced in by the land grant board, from 1869 to 1877. During this period the father of the defendant had purchased certain of said lands and taken certificates therefor in the names of different parties, but for his own benefit, which certificates are claimed to have been assigned to defendant. These lands are shown to be valuable for the pine timber thereon, estimated at 7,500,000 feet, and it appears that the father of defendant was aware of this fact when he purchased same, but he denies making any representations to the commissioner on the subject, and there is no other evidence on this point. No timber affidavits were required. In 1875, application was made for the purchase of the lands in question, and five dollars per acre tendered therefor. In February, 1876, the Land Commissioner, acting on his own motion, demanded the surrender of the certificates, which was refused, and in March following, the Attorney General commenced suits to cancel said certificates, making the parties named therein, as also defendant and his father, parties. April 25, 1877, the land board referred the matter of sales of agricultural college lands, where sold for three dollars per acre, to the·

Commissioner of the State Land Office and Attorney General, directing them to take such action therein as the interests of the State might require. Under this authority a settlement was made with the defendant in that suit for $4,000, which was paid to the State Land Commissioner and receipted for as in full of all claims on account of the lands in question, and said suits were discontinued, defendant paying the costs.

*Held*, that the failure of Ruggles to inform the Commissioner of the State Land Office of the character of said lands was not an actionable fraud.

That the claim that the certificates were issued to fictitious persons is not tenable, there being no evidence to show that fact, and in its absence the presumption is that they are living. Fraud is not presumed, and it is not ordinarily necessary to negative it until some proof is offered tending to show it.

That the use of the names of third parties in the purchase of said lands, knowing same to belong to the five dollar per acre class, in connection with the other facts in the case, stamps the whole transaction as fraudulent and entitles the State to the relief asked for in this suit, were it not for the settlement referred to.

That the Commissioner of the State Land Office and Attorney General had power to make said settlement, under the resolution of the land grant board, that it was acquiesced in without question until April, 1881, and must be held as barring the present suit.

Appeal from Ingham. (Gridley, J.) Argued October 27 and 28, 1885. Decided January 20, 1886.

Decree affirmed. The facts are stated in the opinion.

*Moses Taggart*, Attorney General for People.

Entries in the names of fictitious persons are void: *Muskingum Valley T. Co. v. Ward*, 13 Ohio, 120; *Hulick v. Scovil*, 4 Gilman (Ill.) 159; *Bensley v. Atwill*, 12 Cal. 231, 236; *Miller v. Crittenden*, 2 Ia. 368; *U. S. v. Colorado Coal & Town Co.*, 18 Fed. Rep. 273; *McCracken's Heirs v. Beall*, 3 Marsh, 210; *Galt v. Galloway*, 4 Pet. 345; *McDonald's Heirs v. Smalley*, 6 Pet. 261; *Galloway v. Finley*, 12 Pet. 264.

The sale being in violation of and contrary to the law, is void: *Atty. General v. Smith*, 31 Mich. 359; *Remeau v. Mills*, 24 Mich. 15; *Western Pacific R. R. Co. v. U. S.*, 108 U. S. 510; *Polk's Lessee v. Wendal*, 9 Cranch, 87; *Sherman v. Buick*, 3 Otto, 209; How. Stat. §§ 5227–5316. The authority conferred upon the land grant board by the Legislature was a trust reposed in it as a body, and such power and

authority could not be delegated to a committee composed of two of its members: Cooley Const. Lim., 5th ed., 249; *Lyon v. Jerome*, 26 Wend. 485; *Davis v. Read*, 65 N. Y. 566; Dillon Munic. Cor., 1st ed., § 618; *Boylston Market Association v. Boston*, 113 Mass. 528; *Supervisors v. Brush*, 77 Ill. 59; *Oakland v. Carpentier*, 13 Cal. 540.

*Isaac Marston*, of counsel for People:

The question in this case is whether defendant by a systematic course of dealing shall be permitted to defraud the agricultural college out of the lands in question, which are worth at least fifty thousand dollars.

Ruggles intended to defraud the State. He knew the law as to the sale of this class of lands and the practice of the office to require timber affidavits. Such a transaction cannot be sustained: *Atty. General v. Smith*, 31 Mich. 359; *Atty. General v. Thomas*, 31 Mich. 365.

The agricultural land board was given the control and management of the selection, the care and disposal of the lands (How. Stat. § 5368), and could authorize the Commissioner of the State Land Office to sell the same: § 5372; and this was practically the extent of their authority at the time of the passage of the resolution authorizing a settlement with Ruggles. The board could not have intended to authorize a settlement with persons who had purchased lands contrary to law, and still held the certificates: How. Stat. § 5316.

*M. J. Smiley* and *Ashley Pond*, for defendant:

It is submitted that the Attorney General never had any right of action against the defendant on account of the purchase of these lands. They were granted to the State by Congress for the purpose of providing a college for the benefit of agricultural and the mechanic arts. Were accepted in 1863 by the State and an "agricultural land grant board" created with certain statutory powers and duties: How. Stat. § 5368, *et al.* Section 5372 requires the Commissioner of the State Land Office to make out a certificate stating price per acre, etc. Establishing price per acre necessarily required the commissioner to decide whether the land was valuable for the timber thereon and the purchaser had a right to conclude when the commissioner fixed price at three dollars per acre, that he had determined that fact in the negative. The purchaser was under no obligation to disclose to the commissioner what he knew about the value of the

land or the timber. It is a question of fact about which parties honestly differ: *Cowell v. Lammers*, 21 Fed. Rep. 200.

If a right of action ever existed in favor of the State, it has been compromised and settled in the former suits, and the dismissal of these constitutes a bar to the prosecution of this suit for the same cause: Daniel's Chan. Plead. and Prac., Vol. I, 659; *Orphan Asylum v. M'Cartee*, 1 Hop. Ch. Rep. 372.

MORSE, J. September 7, 1881, Jacob J. Van Riper, then Attorney General of the State, filed an information in the circuit court for the county of Ingham in chancery, asking to have four part-paid certificates for the purchase of agricultural college lands set aside, canceled, and delivered up, because of fraud in the purchase or entry of the same. The lands embraced in the certificates are described as follows: The south-east quarter of section two, in township 24 north, of range 8 west, certificate issued in the name of Edwin Buckley, March 15, 1871; the north-east quarter of section 34, town 21 north, of range 11 west, certificate issued in the name of Edward McLaughlin; the south-east quarter of section 34, town 21 north, of range 11 west, in the name of John M. Dennitt; and the south half of the south-west quarter of section 28, town 21 north, of range 11 west, in the name of James Rawlins,—the last three certificates being issued March 6, 1872. These certificates were applied for by Daniel D. Ruggles, father of the defendant, and procured by him, in the name of said parties, at the price of three dollars per acre, one-fourth paid down, and the balance at the option of the purchaser, with interest. The lands were obtained for the benefit and sole use of said Daniel D. Ruggles, he using the names of these parties for the purpose, as he says, of putting his neighbors off the scent of his buying land in that locality. It is claimed that these certificates have been assigned to or are holden by the defendant. These lands belong to the dower of the agricultural college. They are a part of the donation of the United States, for the benefit of this college, under an act of Congress dated July 2, 1862, and were accepted by the State, February 2, 1863.

At the session of 1863, the Legislature granted to the agricultural land-grant board the care and disposal of these lands, subject to a limitation that they should not be sold for less than two dollars and fifty cents per acre, one-fourth to be paid at the time of purchase, and the balance at the option of the purchaser, with interest at seven per cent. per annum. This land-grant board was composed, by law, of the Governor, Attorney General, Auditor General, Secretary of State, State Treasurer, and Commissioner of the State Land Office. The lands were selected under their direction, and it was the general purpose to select lands for agricultural use, rather than for the pine growing thereon, as it was supposed farming lands would sell more readily, and the college thereby sooner realize the benefit of the grant. The location of the lands was not completed until 1868, when they were put upon the market. They were first offered at public sale under a resolution of the board; but there being no bidders, were then, by the Commissioner of the Land Office, opened to private sale. Under the act of the Legislature of 1863, the board could enhance but not reduce the price, and they fixed the minimum at five dollars per acre. The first sale of these lands was on the thirtieth day of October, 1868, and they were sold until March 16, 1869, at five dollars per acre; 1,680 acres being so sold. The Legislature of 1869, on that day, amended the act of 1863; the act taking immediate effect, the amendment providing that said lands should not be sold for less than three dollars per acre, one-fourth to be paid at the time of purchase, and the balance at the option of the purchaser, with interest upon said balance at seven per cent. per annum; and providing, further, "that all of said lands which are valuable *principally* for the timber thereon shall be sold for not less than five dollars per acre, the whole of the purchase money therefor to be paid at the date of purchase." Whatever may have been the object of this act the effect was to increase the sales and lessen the price. April 8, 1869, the buyers began to rush into the commissioners' office, and almost everybody got the lands at the lowest price. From that date until March 6, 1872, out

of some 40,000 acres sold, only 3,540 acres were sold for five dollars.

By the passage of the act of 1869, amending the law of 1863, these lands were divided into two classes; but, by a strange oversight or a neglect of duty which has cost the agricultural college thousands of dollars, no steps whatever were taken to estimate the value of the timber upon these lands, or to classify them, so thất the commissioner could know what descriptions were valuable because of the timber growing thereon. Therefore the commissioner, in selling these lands, had to rely upon the statements of the purchaser, or upon affidavits filed, presumably, generally, if not always, in his interest. There is no doubt from the record before us that thousands of acres of these lands, of great value because of the pine and other timber upon them, have been sold as three-dollar lands, one-quarter only paid, stripped of their timber, their only value, and then no further interest or taxes paid by the purchasers. The squandering of so much of this valuable gift to the agricultural college must be laid to the failure of the officers who had the care and disposal of these lands to take proper and necessary measures to so classify and identify them that they would know what they were selling. The defendant in this case is not alone liable to the charge that he has fraudulently used his own knowledge to impose upon the ignorance of the land commissioner. This fraud, if fraud it can be called, has been going on for years, under the eyes of the officials whose plain duty it was to prevent it. I cannot find from the record that this agricultural land-grant board, composed of State officers,—the Commissioner of the Land Office being one of them,—from April 8, 1869, when the three-dollar sales commenced, up to March 1, 1877, nearly eight years, took any notice of these sales whatever, except to invest the proceeds thereof, at which last date they met and passed the following resolution:

"*Resolved*, that the Commissioner of the Land Office be requested to submit to the Attorney General the facts within his knowledge in relation to part-paid agricultural lands,

where the same have been stripped of timber for which the lands were valuable, said lands now being abandoned by the purchasers, and ask his opinion in writing as to the proper action to be taken by this board to secure the State from loss. Also what action is advisable to be taken when said lands have been sold at three dollars per acre, on affidavit of purchaser that the lands were not valuable for timber, when the contrary was the fact, and the said lands sold for five dollars per acre, as provided by law."

And at a meeting April 25, 1877, Mr. Partridge, then commissioner, vainly endeavored to have an examination and classification of these lands ordered by the board as to the quality of lands, soil, and timber; which it is obvious should have been done at the outset. From 1869 to 1877 it was the practice of the commissioner, by the acquiescence, at least, of the board, to sell these lands upon the statements and affidavits of the purchaser. It is not strange that valuable timbered lands have been sold at the lowest price under such management.

The complainant claims that these certificates, obtained under this course of sale in 1871 and 1872 by Daniel D. Ruggles, should be canceled because the lands described therein were valuable principally for the pine timber upon them; that Ruggles located them for that reason; that he knew they were valuable because of the pine upon them, and kept such knowledge from the commissioner, and took the certificates in the name of the fictitious persons, to blind the commissioner as to their real worth and character.

The evidence shows that, upon these lands, by the examination and report of the State examining agent, there is now standing about 7,500,000 feet of pine. It is also evident from the testimony of Daniel D. Ruggles that he knew the character of these lands when he located them, and entered them because of this pine timber then growing thereon. He denies making any representations that they were not valuable for timber at the time of the purchase, and what took place between him and the commissioner, Edmunds, must be gleaned from his testimony alone. It was intimated upon the argument that, from the character

of the commissioner, it might be inferred that he was a party to the fraud; but there is no direct evidence in the record tending to show any collusion whatever between the commissioner and Ruggles, and Ruggles explicitly denies that there was any arrangement between them. The absence of any timber affidavits accompanying these entries might incite a suspicion of some collusion between them were it not for the fact that the filing of such affidavits seemed to be the exception rather than the rule of the office. The fact that Ruggles also located, between the years 1870 and 1874, many acres of these same lands for three dollars, and stripped the timber from them, and then abandoned them, is cited to show the fraudulent character of the entries here. The testimony of Ruggles, that he made no representations in regard to the character of these lands, and that there was no collusion between him and the commissioner, but that he went into the office, and stated that he wished to purchase these lands, if he could do so for three dollars per acre, and that upon such statement the commissioner issued these certificates as Ruggles directed to the parties named, seems to be entirely consistent with the general practice of the land office in those years.

It does not seem to me that it was an actionable fraud in the mere fact of Ruggles not divulging to the commissioner the knowledge that he possessed that these lands, if not then so, would sometime be valuable for the pine upon them. If this retention of knowledge be sufficient to vitiate this sale to Ruggles, then no doubt but a large number of the other sales of these lands to other persons are also voidable for the same reason. It was not alone such a fraud upon the State, under the circumstances of the usual method of disposing of these lands to all purchasers, as would destroy the validity of these entries. Such a principle, applied to matters of bargain and sale between individuals, would void almost every transaction in business life. Few purchases are made unless with the idea of buying for profit, and at a supposed cheaper rate than the article bought will bring to the purchaser on use or resale.

It is also claimed that these purchases are fraudulent because the certificates were issued to fictitious persons. But there is no evidence to show that they are fictitious. The reasoning that the want of proof that such persons existed at the time of the entries raises the presumption that they were men of straw, is erroneous. In the absence of any testimony upon the subject, the presumption would be that they were living. It did not devolve upon the defendant, at any rate, to show these men to the court, without the slightest evidence being introduced to show that they were fictitious names. Fraud is not presumed, and it is not ordinarily necessary to negative until something has been offered tending to show it.

In our opinion the fraud of Ruggles consisted, not in the use of fictitious names, because we cannot say they were so, nor yet alone in his silence as to the valuable timber upon these lands, but we think that, knowing them to belong to the five-dollar per acre class under the law, he used the names of these men, not to put his neighbors off the track of his purchases as he claims, but for the express purpose of blinding the commissioner to their real worth, or else there was collusion between him and that official. While there is no direct evidence of fraud upon his or the commissioner's part, the circumstances all taken together satisfy us that a fraud was committed in some way. We have not the testimony of the commissioner, and Ruggles makes a square denial of all fraud. We are left, therefore, without any witness of this transaction from whom we can glean the truth. But the fact that so much valuable timber was growing on these lands; that Ruggles had full knowledge of its worth, and remained silent; that no timber affidavits can be found; that the frauds under the same commissioner are matters of public history; that Ruggles made the entries in the names of other men, and a different man for each parcel; and the further fact that other lands have been bought in the same way, and to a large extent skinned of their timber by this same Daniel D. Ruggles, and then forfeited as to payment of interest and taxes—all considered together, must

convince any one that fraud was intended and perpetrated upon the State. While one, or perhaps more, of these circumstances may not be sufficient to overcome the presumption of honest dealing, to which every man in law is entitled, or to shake the denial of Ruggles, yet, added and occurring together, their full weight impresses upon the whole transaction the stamp of fraud; and such a fraud as would, were it not for the claim of settlement, make it our duty to grant the State the relief asked in this proceeding.

It is also urged upon the part of the State, that the Commissioner of the Land Office had no power to sell these lands for three dollars; and that the sale, being in violation of law and contrary to it, was void. By the act of the Legislature in 1863, which was not affected in this respect by the amendment of 1869, the care and disposal of these lands was given to the agricultural land-grant board. It is true that the Legislature, in 1869, put two prices upon these lands, as heretofore noticed, yet that body left the matter of sale as before, under the direction of the land board, in the hands of the commissioner. It made no provision for the classification of these lands by examination, to determine what pieces should be held at the minimum of three dollars, or what at five. The land board also left the division of these lands to the commissioner, who, for eight years and upwards, sold them as before stated. If he had no power to sell to Ruggles, he had no authority to sell any of these lands, which he has sold in all these years, for three dollars per acre, if it shall now turn out, upon examination, that the timber upon them is valuable. It appears to me that, by the action of this board in allowing the commissioner, who was one of them, to determine for himself, between him and the purchaser, to what class the lands belonged which he sold until March 1, 1877, without any protest whatever, it is conclusive that they authorized and approved the course of the sales, and the method of procedure adopted to determine what price should be set upon them. The records of the land office showed every day the amount of sales, the price, and the names of the purchasers; and their receipt and

investment of the proceeds should estop them from claiming otherwise. That they had the right to determine, or to authorize the commissioner to determine, what portion of these lands should be sold as timbered lands, under the statute of 1863, as amended by the act of 1869, is beyond question, provided such action was not the result of fraud on their part. That they were not as attentive to their duties as they should have been, and not as watchful of the interests of the State as the people had a right to expect of public officers, cannot, in my opinion, invalidate the purchases made by Ruggles and other parties at this late day. If the revenue of the agricultural college has been as woefully decreased as the Attorney General claims, much of it, he admits, has gone beyond recall, and the fault is that of a too lax attention to public duties, which must be borne by the institution, whose legal guardians have neglected to "lock the stable door until after the horse has been stolen." If these lands had been placed in the care and keeping of a body of men who would have watched them as their own, this fraud of Ruggles could not have been consummated, and this great loss to the agricultural college and the State would not have occurred. This agricultural landgrant board held but three meetings, as the record shows, from December 7, 1869, to March 1, 1877, and these only for the purpose of investing the money received from the sales.

It is also apparent from the record that, had it not been for the intervention of one John Canfield, who became anxious to get these lands at five dollars per acre, Mr. Ruggles would not have been disturbed in his possession of these certificates. They had been issued nearly six years before the board took any action looking towards their cancellation, or gave any intimation that the purchase of the lands was either fraudulent or without authority, and during nearly all this time the sales were going on in the manner precisely of Ruggles' purchase. When Canfield first made his application, and tendered his money at five dollars per acre for these lands, he was informed by the commissioner that they

were already located.   July 1, 1878, the commissioner also wrote him that if he claimed the lands under his application and tender, he must make it manifest before the twenty-first day of that month, as after that date, the original purchasers at three dollars would be allowed to keep the lands by paying the additional two dollars.   Canfield made his application in 1875, but even then no steps were taken by the board to cancel these certificates until March, 1877, when the resolution heretofore given was adopted.   In February, 1876, the Commissioner of the Land Office, acting on his own motion, demanded the surrender by Ruggles of these certificates, which was refused.   I find no action of the board in reference to these particular lands until January 26, 1881, when they proceeded to take up a petition presented to them by Canfield in relation thereto, and cited the defendant and his father to appear before them and show cause why these entries should not be canceled.   March 31, 1881, the matter was heard by the board, and April 1 of the same year they decided the purchases to be fraudulent, and elected not to confirm the sales, claiming to act under the authority of joint resolution No. 28 of the Session Laws of 1879.   After this action the commissioner again demanded of the defendant that he surrender the certificates, which he again refused to do.   In the mean time, and on the fourth day of March, 1876, Andrew J. Smith, then Attorney General of the State, filed four separate informations, in the circuit court for the county of Ingham in chancery, for and in behalf of the State, embracing one of these pieces in each suit, and making Daniel D. Ruggles and Charles F. Ruggles and the person in whose name the certificate was taken defendants.   These informations were taken, as confessed against the persons named in the certificates, and were answered to by the defendants Ruggles.   Whether these suits were instituted by the board does not appear, but the object of them was identical with the present suit, to wit, the cancellation of these certificates on account of fraud in the purchase.   April 25, 1877, the board referred the matter of sales of agricultural college lands which had been sold at three dollars per

acre to the Commissioner of the Land Office (B. F. Partridge) and the Attorney General (Otto Kirchner), directing them to take such action thereon as the interests of the State might require.    This is all the record I find of their action in the premises.

Presuming to act under authority of this resolution, the commissioner and Attorney General entered into negotiations for the settlement with Charles F. Ruggles of the controversy between him and the State as to his three-dollar purchases of lands, and on the thirty-first day of December, 1878, as a result of these negotiations, the defendant in this suit paid to the commissioner $4,000, and received the following receipt:

"Received of Charles F. Ruggles $4,000, in full of all claims of the State against the said Ruggles on account of the alleged irregular sale of part-paid lands.    This payment is in full of all claims on account of lands involved in the four suits now pending against said Ruggles, and of all lands that heretofore have been or now are owned wholly or in part by him, and covers all claims of the State for timber.

"B. F. PARTRIDGE, *Commissioner of Land Office.*
"*Dated Lansing, Mich., December 31, 1878.*"

And April 2, 1880, stipulations signed by said Otto Kirchner, Attorney General, and the attorney of defendant Ruggles, of date March 30, 1880, were filed in said suit, discontinuing them, in accordance with said settlement.    Besides the $4,000 paid as aforesaid, Ruggles also paid $298.82 as interest upon said certificates, and $150 in lieu of all costs in the suits, and received receipt therefor.

It is claimed by the defendant that this was a full and fair settlement of the matters involved in the present controversy, and for this reason, if for no other, the decree of the court below should be affirmed.    On the other hand, the Attorney General claims: *First*, that this settlement was not understandingly made by the commissioner and the Attorney General; *second*, it was not authorized by the agricultural land-grant board; *third*, it could not legally be made by the board through any or all of its members.

It is clear to me that both the commissioner and the Attor-

ney General fully understood what they were doing when they made this settlement. The first negotiations commenced, as the Attorney General swears upon his motion, upon consultation with the commissioner and Hon. Charles Upson, who was retained by the State. He testifies:

"After talking with Mr. Upson about the matter, and also with Gen. Partridge, I came to the conclusion that if the State could get from Mr. Ruggles the difference between the price paid by him and the price the State claimed he ought to have paid, that it would be for the best interest of the State to settle upon that basis."

These negotiations commenced in the summer of 1878, and were delayed some time in order to give Mr. Canfield time to assert his claim if he desired to do so. It appears from the evidence of the commissioner that such notice was given him, and he, failing to do anything in response thereto, the matter was closed up on the last day of the commissioner's term. It is argued as a suspicious circumstance that Gen. Partridge should have received this money and given this receipt at so late an hour, on the last day of his term of office, that it could not be deposited in the State treasury until the next morning. There is not a shadow of testimony implicating Gen. Partridge in any collusion with Ruggles, and it was entirely proper, having had the matter in charge, that he, who knew all about it, should close the transaction, if it were for the interest of the State to settle at all, before he went out of office. There is no doubt but the commissioner fully understood the terms of settlement; but the Attorney General argues that Mr. Kirchner did not understand it, and thought Ruggles was paying the full difference between three and five dollars upon all the lands he had purchased from the State, which would have been a much larger sum than he actually paid. Mr. Kirchner did not sign the stipulations discontinuing these suits until the last of March, 1880, and he would certainly have been most derelict in his duty as a public officer if he had thus stipulated, after this length of time, without knowing what he was doing. But his own

evidence settles his knowledge. He knew the sum that was paid.

*Question.* "Had you been informed that Ruggles was at that time indebted, on a basis of five dollars an acre, to an amount of over $20,000 to the State, would you have consented to that settlement of $4,000?" *Answer.* "I don't think it would have made the slightest difference. What I intended to settle was these suits, and for the land involved in them, and if, for the lands involved in these suits, I could get enough money so that the amount paid upon the settlement, together with the amount paid by Ruggles, would have amounted to five dollars an acre, I would settle it. Yes, sir, settle those suits; that is what I intended to do."

The fact that Mr. Kirchner did not intend to settle any more than these suits, or that the receipt ran so as to cover other lands than these now in question, cannot void the transaction as far as these are concerned. If hereafter a question should arise upon other lands, it might with some propriety be claimed that Mr. Kirchner did not consent to a settlement as to them; but as to these four certificates there can be no question but both the commissioner and the Attorney General knew what they were doing, and that the State received the full amount asked and required by them.

I have no doubt of their power to make this settlement. The State must have some agent or agents through which it may act. It cannot be a myth. Its officials must, from the very nature of things, have power to conclude it. As heretofore shown, the Legislature granted unreserved power to the land-grant board to dispose of these lands. Its authority to do so is not denied. This board, by its acts and its acquiescence, empowered the commissioner to make these sales. The law officer of the State commences suit to cancel these certificates. He, in connection with the commissioner, believed it to be for the best interest of the State to settle. The land-grant board meets. These two members, as the evidence shows, make a full statement to the board of the matter, and that it is best to settle. The matter is fully discussed, and the result is the resolution authorizing and directing them to act in the matter as they shall deem best

for the interests of the State.  They settle accordingly.  The settlement rests without question until April, 1881, as far as the board is concerned, and is then only brought up because of the petition of John Canfield, filed in January of that year.  It then rests until September 7, 1881, when this information is filed; Ramsdell & Benedict, Canfield's attorneys, appearing in the record as of counsel for the State, in connection with the Attorney General.  If the absolute care and disposal of these lands were vested in this board—and there is no question about it—they certainly had the right to settle and dispose of all controversies arising as this does.  It is claimed they could not delegate the power of settlement to the Attorney General and the commissioner, and we are referred to cases where it has been held that legislative and municipal bodies could not delegate their law-making powers to a committee.  The principle does not apply here.  It seems, from the testimony of both Gen. Partridge and the Attorney General, that the whole matter of contemplated settlement with Ruggles was laid by them before the board, and there discussed.  Such idea of settlement was fully approved by the board, as these officers say, and the result was the resolution under which they acted.  I see no legal objection to the authority of the board, when suit commenced by the Attorney General, and under his direction, was pending, to empower this officer alone to settle and discontinue this proceeding.  It was not necessary, in my opinion, for the board to formally ratify an action which they had authorized beforehand.  Yet it will not be contended but if they had so formally ratified it, such action would have foreclosed their right to complain of it.

As far as these lands now in suit are concerned there has been a full settlement, and the money paid by defendant is in the State treasury.  There ought to be some time when a man's liabilities can be ended, after payment of all that is asked by the officials representing the State.  I see no reason to distinguish this case, although the State is a party, from like cases between individuals.  The State has once commenced, by its duly authorized officers, litigation involving

the identical subject-matter in this suit, and afterward deliberately, through and by the same officials, compromised, settled and discontinued the same.   The defendant Charles F. Ruggles paid his money seven years ago in consideration that this claim of fraud was forever barred.   The State accepted and received it upon the same understanding, and now holds the four thousand odd dollars then paid.

It is right, as the court below decreed, that the present suit should be dismissed.   The action of that court in the premises is therefore affirmed.

The other Justices concurred.