THE STATE OF MICHIGAN v. EDWARD W. SPARROW AND THE MICHIGAN LAND & LUMBER COMPANY (LIMITED).

[See 56 Mich. 567.]

*Public lands — Internal improvements — Constitutional law — Res judicata.*

1. One who, under contract with the State, obtains the right to select from its public domain any lands which he has earned by the fulfillment of his contract, is entitled to select the choicest and most valuable lands, and is under no moral or legal obligation to give to the State any information he may have of their value.

2. If the State chooses to sell lands for which it has not received a patent, and a purchaser chooses to buy them, any complication thereafter arising as to title concerns only such purchaser and a patentee of the general government.

3. Courts cannot attach limitations or provisions to an act of the Legislature because in other similar acts they have been incorporated.

4. It is not true that it has been the uniform policy of the State, either before or since the year 1857, not to apply lands to

works of internal improvement until patents had been received therefor from the general government, and the lands had been offered at public sale.

5. Where, in a *mandamus* proceeding by a contractor against the Commissioner of the State Land-Office to compel the reservation from sale of certain lands which he had selected on his contract, his right to the lands is affirmed, the State cannot maintain a suit in equity to set aside patents of said lands issued to the contractor on the strength of such decision, upon the ground that it had another defense, which it omitted to make in the *mandamus* proceeding. *Fifield v. Edwards*, 39 Mich. 264.

6. The Court do not pass upon the validity of the taxes provided for in Act No. 130, Laws of 1883, and Act No. 84, Laws of 1885, to pay the cost of improving the Cedar and Looking-Glass rivers in excess of the appropriation of swamp lands therefor, nor upon the validity of the title to the lands patented under said acts; but simply refuse to decree the cancellation of the patents.

Appeal from Ingham. (Peck, J.) Argued June 29, 1891. Decided December 22, 1891.

Bill to cancel patents of swamp lands. Defendants appeal. Reversed, and bill dismissed. The facts are stated in the opinion.

*A. A. Ellis,* Attorney General, and *Moses Taggart* (*Austin Blair,* of counsel), for complainant.

*Frank E. Robson* (*Isaac Marston,* of counsel), for defendants.

*Otto Kirchner, amicus curiæ.*

GRANT, J. The bill in this case is filed by the State for the cancellation of certain patents for lands issued to defendant Sparrow. The defendant company is a grantee of Sparrow.

These patents were issued under the authority of Act No. 130, Laws of 1883, and Act No. 84, Laws of 1885. Under the former act, 10,000 acres of swamp lands in the

Lower Peninsula were ' appropriated to aid in certain improvements in the county of Livingston. By the latter act, 12,800 acres were appropriated for a like purpose in the counties of Shiawassee and Clinton. These appropriations were of swamp lands not otherwise appropriated. These acts are so similar that the same legal principles govern both; the chief difference being in the fact that the first act provided for raising the cost of construction in excess of the appropriation of lands by a tax upon the lands benefited, while the latter act provided for raising it by subscriptions and taxation.

Defendant Sparrow was the lowest bidder, and contracts for the performance of the work were let to him. It is conceded that the work was faithfully performed, and that Sparrow was entitled to the consideration agreed upon. Upon completion of one-half of the work provided for in the first contract he became entitled to a patent for one-half of the lands. He then made his selections, and applied to the Commissioner to have certain designated State swamp lands reserved from sale. Upon the refusal of the Commissioner to make the reservation, Sparrow applied to this Court for a writ of *mandamus* to compel such action, and his application was granted. *Sparrow v. Commissioner of State Land-Office,* 56 Mich. 567. The provisions of this law are there so fully stated that it is unnecessary to repeat them here. Upon the completion of his cantracts, in August and October, 1887, Sparrow made his selections of lands, and applied for his patents. The State Land-Office took the application under advisement. The Commissioner took counsel of the Attorney General, and on October 14 and 17, and November 4, 5, and 7, the patents were issued.

It was conceded and insisted by both parties to this litigation that by the swamp-land act of Congress of September 28, 1850, and by the subsequent agreement on

the part of the State to accept the grant on the basis of the field-notes on file in the Surveyor General's office, the title to these lands vested in the State, and that the grant was one *in præsenti*. The lands now in controversy were designated as swamp lands on the field-notes. By this concession we are therefore relieved from a discussion or determination of the question whether that act vested the title in the State, or whether a patent from the United States government was necessary to complete it. The rights and equities of other parties, some of whom claim title to a portion of these lands by purchases from railroad companies, which claim title thereto by the act of Congress of June 3, 1856, and others of whom claim title by patent from the United States, cannot be here considered. They are not before the Court. Their rights and equities must be determined in direct proceedings brought for that purpose. Some such proceedings have been instituted, and are still pending in other courts.

The complainant seeks to have these patents annulled for three reasons:

1. Because the acts authorizing them are defective and unconstitutional.

2. Defendant Sparrow was found guilty of fraud.

3. The lands had not been patented to the State, nor offered at public auction.

1. The first question is *res judicata* by the decision in *Sparrow v. Commissioner of State Land-Office*, 56 Mich. 567.

2. The learned counsel for the State do not claim that Sparrow was guilty of fraud in fact, but insist that the value of the lands was so greatly in excess of the consideration paid as to constitute a legal fraud upon the State. If this principle were adopted as between the State and the grantees of its lands, many titles would

rest upon a very insecure foundation. One who, under contract with the State, obtains the right to select from its public domain any lands which he has earned by the fulfillment of his contract, is entitled to select the choicest and most valuable lands. He is under no moral or legal obligation to give to the State any information he may have of their value. These lands were selected and patented in the manner usual from the beginning. If they were subject to selection under the law, the State officials could not refuse selection and patents because they considered them of value largely in excess of the value of the work performed. The contract was not to select lands commensurate in value with the consideration, but to select any lands which the State owned, and which were subject to be appropriated for that purpose. This is too clear to require argument. Complainant's proofs go no further than to show that these lands with an unclouded title were worth a much greater sum than Sparrow paid. There was no haste or any improper conduct on his part. The State contested his right in the court, and finally issued the patents after mature deliberation, and after receiving the advice of eminent counsel. Even if the State officials had known the value of these lands, they could not have been justified in withholding the patents. The Legislature had imposed no limitation in these acts to lands of any particular value, and it is not within the power of the officials of the State nor of the courts to impose such limitation. Such action on the part of either would be a clear usurpation of legislative power.

The numerous authorities cited by counsel for the State, holding that inadequacy of consideration may be so great as to shock the moral conscience, and be conclusive evidence of fraud, do not apply to cases like the

present.[1] I am not aware of any instance before where a state or the national government has sought to set aside its patents because the land conveyed was worth more than the price paid. Furthermore, the value of these lands was upon the surface, and open to the knowledge of every one who chose to go and see them. It is a proposition of novel character that a vendee, at the risk of being charged with fraud, must inform his vendor of the value of the land offered for sale. As between individuals, the promulgation of such a doctrine would justly be the subject of ridicule. It is relieved of none of its absurdity from the fact that it is set up by the State.

3. The third reason urged by complainant is that the Legislature, by these acts in question, did not intend to include lands for which the State had received no patent from the general government, and which had not been offered at public auction, because:

(1). Complications were liable to arise on account of the general government having failed to give to the State patents, the best evidence of its title.

(2). The uniform policy of the State from 1857 has been not to apply land to works of internal improvement until patents had been received, and the same had first been offered at public sale.

(3). The value of the State's swamp lands was only fixed or determined by advertising and offering at public sale; and in the letting of contracts, if such land were included, there would be no method of determining the value of the consideration for work to be done.

I am unable to see any force in the first of these rea-

---

[1] Counsel cited Kerr, Fraud & M. 187, 416; Wait, Fraud. Conv. § 232; *Howard v. Edgell*, 17 Vt. 9, 27; *Summers v. Griffiths*, 35 Beav. 31; *Eyre v. Potter*, 15 How. 42, 61; *Smith v. Robertson*, 23 Ala. 312; Story Eq. Jur. §§ 121, 124, 246; *Hamet v. Dundass*, 4 Penn. St. 178; *Coles v. Trecothick*, 9 Ves. 246; *Underhill v. Horwood*, 10 Id. 209; *Peacock v. Evans*, 16 Id. 512; *Wright v. Wilson*, 2 Yerg. 294; *Brown v. Lamphear*, 35 Vt. 252; *Allen v. Hammond*, 11 Pet. 63; *Hardeman v. Burge*, 10 Yerg. 202; *Howell v. Baker*, 4 Johns. Ch. 118; *Byers v. Surget*, 19 How. 303; *Morriso v. Philliber*, 30 Mo. 145.

sons, as applied to the State. The State, through the Legislature, might refuse to sell or convey any of its lands until such patent was received. Such were the provisions of the law of 1858. How. Stat. §§ 5390–5408. If the State choose to sell any of its unpatented lands, and a purchaser chooses to buy them, no complications that might arise thereafter would concern the State, but only such purchaser and a grantee from the general government.

There are several obvious replies to the second reason:

*First.* The fact that this policy was incorporated in express terms in several acts of the Legislature appropriating these swamp lands furnishes no reason for the conclusion, either as a matter of law or fact, that the Legislature intended to include it in an act where they omitted it. On the contrary, the proper conclusion is that they purposely omitted it. No such rule of interpretation exists. Courts cannot attach limitations or provisions to an act of the Legislature because in other similar acts they have been incorporated. The entire subject of the disposal of these swamp lands was under legislative control; and if, as claimed by counsel for complainant, it be a fact that under the various acts appropriating these lands, independent of the board of control, with one exception, no land unpatented and unoffered had been claimed or taken, still I do not think that would justify the courts in holding that the Legislature intended to place this limitation' upon the acts in question. Whenever the act of the Legislature authorized an appropriation to be made under the board of control, the law expressly limited such board to the patented and offered lands. But when the Legislature itself has taken the disposal of any lands away from the board, and appropriated them for internal improvements, the plain provisions of such acts must govern them.

*Second.* It is not true that this has been the uniform policy of the State, either before or since the year 1857. Unpatented swamp lands have been disposed of by the Legislature as follows, viz.: Under Act No. 187, Laws of 1851, 142,933 acres; under Act No. 166, Laws of 1855, 8,000 acres; under Act No. 173, Laws of 1867, 160 acres; under Act No. 239, Laws of 1863, 200 acres; under Act No. 49, Laws of 1885, 240 acres. Under Act No. 239, Laws of 1863, 8,000 acres of unoffered lands were disposed of by the State. Under this record the general policy of the State becomes unimportant in the interpretation of the acts in question. No such practical construction is thereby established which can justify the courts in adopting it.

*Third.* The principle contended for by the State is clearly decided against it in *Houghton Co. v. Commissioner of State Land-Office,* 23 Mich. 270, and in the unreported case of the same county against the Commissioner of the Land-Office, decided in this Court October 19, 1883. In the former case Mr. Justice CHRISTIANCY used the following language:

"There is nothing in the act of appropriation confining the right of the county to select to lands subject to private sale at the minimum price, and to give it this effect we should be compelled to add to the act a provision or reservation which the Legislature did not see fit to insert. This we have no right to do, however unwise we might deem the omission; there being nothing from which such an intent can be inferred."

In the second case above referred to the petition was filed in this Court June 19, 1883. The answer was filed August 30. It contained the following averments to show why the writ should be denied:

"*First.* Because the act of Congress known as the 'Swamp-Land Grant,' approved September 28, 1850, requires the Secretary of the Interior to make out accu-

rate lists and plats of the lands described therein, transmit the same to the Governor of the State, and at the request of the Governor cause a patent to be issued to the State therefor, and provides that, on the patent thus being issued, the fee-simple to such lands shall vest in the State, and be subject to the disposal of the Legislature.

"*Second.* That the first and third pieces of land described in relator's petition have never been patented to the State of Michigan by the Secretary of the Interior or any other officer of the United States, as appears by the records of respondent's office, and that under said act the fee-simple thereto has not passed to the State of Michigan, or subject to the control of the Legislature thereof, and is therefore not subject to entry.

"*Third.* That the second piece of land described in relator's petition was not patented to the State until September 27, 1865, and that, the patent to said second lot of land not having been issued to the State until after the appropriation made by Act No. 239, Laws of 1863, it was not within said appropriation, and, the State having no title thereto, said piece of land was not subject to entry by relator under such act.

"*Fourth.* That the fourth piece of land described in relator's petition was patented to the State March 7, 1856, but was by act of the Legislature withdrawn from market for the benefit of the Menominee River Railroad Company, under a grant from the State to that corporation; that the grant has been fully satisfied, and this lot of land has reverted to the State.

"*Fifth.* That said fourth lot of land, having once been withdrawn from sale, is not subject to private entry until public notice of the restoration of such lands to market shall have been given, as provided in Act 21, Laws of 1873.

"*Sixth.* That, as appears by the records of the State Land-Office, said fourth lot of land has not been restored to market, as required by said Act 21, Laws of 1873, and is therefore not subject to entry by relator."

It thus appears that the precise questions that are here raised by the complainant were there raised by this same complainant, and decided against it.

*Fourth.* As to the lands involved in the case of *Spar-*

*row v. Commissioner of State Land-Office*, 56 Mich. 567, these questions are *res judicata*. The right of Sparrow to the lands described in his petition was then in dispute. The State could not sever its defenses, and, after being defeated upon the ground it then chose, maintain a proceeding in equity to set aside the patents issued under that decision, upon the ground that it had another defense, which it omitted to make in that suit. *Fifield v. Edwards*, 39 Mich. 264.

Complainant's third reason fails in view of what has been already said, and it is unnecessary to discuss it.

We do not decide upon the validity of the taxes provided in either of said acts, nor upon the validity of the title to the lands described in the patents, as they are not involved in this litigation; we simply refuse to decree a cancellation of the patents.

Decree is reversed, and bill dismissed, with the costs of both courts.

CHAMPLIN, C. J., and LONG, J., concurred with GRANT, J.

MORSE, J. *(dissenting)*. In this case the title of the lands patented to Mr. Sparrow under Act No. 130, Laws of 1883, must be considered as adjudicated by this Court in *Sparrow v. Commissioner of State Land-Office*, 56 Mich. 567, and cannot now be disturbed. I am free to say, however, that, if the question were an open one, I should adopt the views of the dissenting opinion of Mr. Justice CAMPBELL in that case, believing them to be in accordance with the plain letter of the Constitution, as applied to the clear intent and purpose of the legislative act in question. The act of 1885 has never been passed upon by this Court, but it is claimed that its provisions and purposes are so clearly similar to those of the act of 1883 that the lands patented under it must

also pass to Sparrow, and the title be confirmed in him, under the holding in *Sparrow v. Commissioner of State Land-Office, supra.* I cannot consent that the opinion above noted shall stand except as the law of its own case, or that it shall apply to lands other than those donated under the act of 1883. The act of 1885 is clearly unconstitutional under the rulings of this Court in *Ryerson v. Utley,* 16 Mich. 274; *Anderson v. Hill,* 54 Id. 477; *Wilcox v. Paddock,* 65 Id. 23; *Benjamin v. Improvement Co.,* 42 Id. 628; *Kinnie v. Bare,* 68 Id. 625, 629. And in this statute of 1885 the donation of the land by the State cannot be separated from the unconstitutional features of the act and sustained. The whole scheme is so interwoven—donation, subscription, and taxation—with State interference and control that the whole act must fall, and be considered null and void.

It is urged by the counsel for the State that the lands patented to Sparrow under the act of 1883 were listed and obtained by Sparrow in fraud of the State. The record shows that the improvement of the Cedar river under that act cost Mr. Sparrow about $16,000. The Looking-Glass improvement, under the act of 1885, cost him about $9,500. For these jobs he located and received lands worth certainly over $100,000, and probably a million of dollars. It is claimed that Sparrow employed agents to look over these lands, and through them, and from other sources, obtained a knowledge of their value which the officers of the State did not possess, and that the lands would not have been patented to him had the State officials known that they were timbered lands, and of great value; that the lands he acquired are worth several hundred thousands of dollars; and that their great value, received, as they were, for a consideration of only $25,500, renders the transaction grossly inequitable, and

shocks the moral conscience. This same contention was made in the case of *Attorney General v. Ruggles,* 59 Mich. 123. We held in that case, at page 130, that it was not an actionable fraud in Ruggles not divulging to the Commissioner of the State Land-Office his knowledge of the value of the lands; that "it was not alone such a fraud upon the State, under the circumstances of the usual method of disposing of these lands to all purchasers, as would destroy the validity of these entries." The same reasoning applies here. This record shows, as did the record in that case, that no steps were taken by the State authorities to examine these lands and ascertain what they were worth until the mischief had been done, and it was too late to remedy it. The magnificent dowry of many thousand acres of valuable lands under the grant of swamp lands by the general government to this State has been frittered away by the inattention and neglect of State officers, and the reckless donations of the Legislature, until nothing of any value is now left to the people. A few speculators in every county of the State have been enriched, with no corresponding benefit to the great mass of our citizens. It is shown that for all these years since 1850 there has been no examination or classification of these swamp lands as to their value. A tract of worthless bog has been held at the same price as a tract of most valuable pine lands; and contractors under the various jobs, inspired in most instances by the speculators who subsequently acquired the lands, have been free to make their own lists and selections of lands donated, limited only by locality.

This case under consideration is a fair sample of the legislation of this State in this respect. The State has donated to Mr. Sparrow lands worth from $100,000 to a million of dollars for two jobs, costing him $25,500, and

the benefit to the State is not appreciable.   Private land-
owners along the Cedar and Looking-Glass rivers have
had some worthless lands reclaimed, and perhaps the
public health in two small localities may have been bene-
fited to a slight extent.    Mr. Sparrow has, however,
been enriched at the public expense, and therefore to
the public damage, and unnecessarily so, and, as I believe,
unconstitutionally.  In this way, by this kind of legis-
lation, a large public domain of the value of many mill-
ions of dollars has been lost to the State, and gone into
the pockets of the favored few at the expense of the
many.   It is no wonder that, when the attention of the
then chief executive, the Honorable Cyrus G. Luce, was
called to this state of affairs, he undertook to remedy it,
and to reclaim, if possible, these lands so wasted and
given away.   No man of integrity could have done other-
wise.   But, as was said in the case of *Attorney General
v. Ruggles, supra,* it is an attempt "to lock the stable
after the horse has been stolen."

It is not the fault or fraud of Mr. Sparrow that has
done the mischief in this case.   He has but followed the
precedent established by others before him, and permitted
and recognized by the State for years as perfectly lawful
and proper.   He was allowed to list and select his lands,
limited only by the Lower Peninsula, and to lands not
otherwise appropriated.   He had the right to examine
the lands open to his selection, and he would have been
a consummate fool, and an enemy to his own household,
if he had not selected the most valuable lands in the list,
rather than to take the poorest, and leave the best to
the next speculator who came after him.   It is alone the
fault of the Legislature and the State officials,—the fault
of the Legislature that it has not provided for the exam-
ination and classification of these lands as to their value,
and that it has improvidently granted them to schemes

that have been proposed for the express purpose of acquiring them for private advantage and profit; and the fault of the State officials that they have neglected their plain duty in the premises until the whole grant has been absorbed at a merely nominal and ridiculous sum as compared with its true value. The patents cannot be taken from Mr. Sparrow because he was more careful in his business than the State was, and did not inform the officials what it was their business to know.

But in so far as the State can reach this matter it should be righted. For these reasons I think the decree of the court below is right, so far as the lands donated under the act of 1885 are concerned; and I concede the title to the lands selected under the act of 1883 to be in Mr. Sparrow, and beyond the reach of the State, only for the reason that this Court has once decided that he was entitled to them, and the law of a case once established must remain the law of such case forever.

McGRATH, J., concurred with MORSE, J.