TAYLOR, C.J.
(concurring in the result only). We concur in that portion of Justice MARKMAN’s concurrence stating that a defendant physician’s multiple areas of specialty “may be considered under [MCL 600.2169(2)] and MRE 702” in barring the testimony of an expert witness who does not possess the same multiple areas of medical specialty. Ante at 582 (emphasis omitted). Thus, we agree with Justice MARKMAN’s concurring opinion that there can be more than one relevant area of medical specialty at issue in establishing a breach of the applicable standard of care, and that a proffered expert may be excluded on that basis. At first glance, Justice MARKMAN’s concurrence appears to be inconsistent with his lead opinion because the lead opinion would only permit evidence of a singular medical specialty to be adduced. The lead opinion concludes that the trial court must choose one, and only one, specialty that is relevant to establishing the appropriate standard of care and precludes the parties from introducing expert testimony with regard to any other relevant specialty. Justice MARKMAN’s concurrence, however, concludes, as we do, that more than one medical specialty may be ger *592 mane in establishing the requisite standard of care and that plaintiffs may be required to introduce expert testimony regarding other relevant specialties.
Furthermore, we agree with Justice Markman’s concurring opinion that the practice and teaching requirements in MCL 600.2169(l)(b) preclude any expert from providing testimony regarding more than one specialty area. Thus, because he opines that plaintiffs can be obligated to produce expert testimony regarding more than one specialty area, and every expert may only testify regarding one specialty area, it logically follows that plaintiffs must be able to utilize more than one expert to establish a breach of the applicable standard of care, a conclusion with which we wholeheartedly agree.
Thus, we believe that Justice MARKMAN’s “concurrence” more closely resembles this opinion than the lead opinion. We therefore concur with his concurrence insofar as it concludes that there can be more than one specialty germane to establishing the appropriate standard of care, and also insofar as it implicitly stands for the conclusion that multiple experts may be utilized in establishing a breach of the appropriate standard of care.[1] As such, there are four votes for these two conclusions of law, just as the lead opinion purports to carry four votes for the conclusions that there can be only one relevant specialty and that only one expert may be utilized.[2] However, in this peculiar, perhaps *593 unprecedented, situation, we conclude that Justice MARKMAN’s concurrence, insofar as it concludes that multiple specialties may be relevant and that multiple experts may be utilized, is the law. Certainly, the fact that Justice Markman lends his signature to two incompatible opinions does not lead to the conclusion that he may cast two separate votes. Rather, because his concurrence was written conceptually later in time than his lead opinion, his concurrence is the law. While some of our analysis goes beyond these two points of his concurrence, it is submitted as the better approach to the statute under review and may be of use in later cases.
INTRODUCTION
In these medical malpractice cases, we granted leave to appeal to consider whether plaintiffs’ proposed expert witnesses qualify under MCL 600.2169 to testify regarding what standards of care the defendant doctors should have met. The trial courts in both cases granted defendants’ motions to strike plaintiffs’ proposed experts on the basis that they were not qualified under MCL 600.2169. In Woodard, a majority of the Court of Appeals affirmed the trial court’s ruling on this issue.[3] In Hamilton, the Court of Appeals reversed the trial *594 court’s judgment.[4] We conclude in both cases that plaintiffs’ proposed experts do not meet the requirements of MCL 600.2169 and, therefore, that plaintiffs have failed to present expert testimony sufficient to support their claims. Therefore, in Woodard, we affirm the part of the Court of Appeals judgment that held that plaintiffs’ proposed expert is not qualified and remand this case to the circuit court for reinstatement of its order dismissing plaintiffs’ claim with prejudice. In Hamilton, we reverse the Court of Appeals judgment that plaintiffs proposed expert is qualified and remand this case to the circuit court for reinstatement of its order granting a directed verdict to defendant.
I. FACTS AND PROCEEDINGS BELOW
A. WOODARD v CUSTER
We summarized the facts underlying this case in our recent decision in Woodard I:
Plaintiffs’ fifteen-day-old son was admitted to the Pediatric Intensive Care Unit (PICU) at the University of Michigan Hospital, where he was treated for a respiratory problem. During his stay in the PICU, he was under the care of Dr. Joseph R. Custer, the Director of Pediatric Critical Care Medicine. When the infant was moved to the general hospital ward, physicians in that ward discovered that both of the infant’s legs were fractured. Plaintiffs sued Dr. Custer and the hospital, alleging that the fractures were the result of negligent medical procedures, namely, the improper placement of an arterial line in the femoral vein of the infant’s right leg and the improper placement of a venous catheter in the infant’s left leg.
Defendant physician is board-certified in pediatrics and has certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine. Plaintiffs’ *595 proposed expert witness, who signed plaintiffs’ affidavit of merit, is board-certified in pediatrics, but does not have any certificates of special qualifications.
Before discovery, the trial court denied defendants’ motion for summary disposition, concluding that plaintiffs’ attorney had a “reasonable belief” under MCL 600.2912d(l) that plaintiffs’ proposed expert witness was qualified under MCL 600.2169 to testify against the defendant physician, and, thus, that plaintiffs’ affidavit of merit was sufficient. After discovery, the trial court granted defendants’ motion to strike plaintiffs’ expert witness on the basis that he was not actually qualified under MCL 600.2169 to testify against the defendant physician. The trial court dismissed plaintiffs’ claim with prejudice, concluding that plaintiffs could not reach a jury without expert testimony.
The Court of Appeals affirmed the trial court’s ruling that plaintiffs’ proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician (Judge BORRELLO dissented on this issue), but reversed the trial court’s dismissal on the basis that expert testimony was unnecessary under the doctrine of res ipsa loquitur, i.e., an inference of negligence may be drawn from the fact that the infant was admitted to the PICU wdth healthy legs and discharged from the PICU with fractured legs (Judge Talbot dissented on this issue).[5] The case was remanded for trial.
Defendants sought leave to appeal the Court of Appeals decision that res ipsa loquitur applies and that expert testimony was not necessary. Plaintiffs sought leave to cross-appeal the Court of Appeals decision that their proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician. We heard oral argument on whether to grant the applications *596 or take other peremptory action permitted by MCR 7.302(G)(1).[6] [Woodard I, supra, 473 Mich at 3-5.]
After hearing oral argument, we issued our opinion in Woodard I, which concerned only defendants’ application for leave to appeal. In that opinion, we reversed the Court of Appeals decision that res ipsa loquitur applied to relieve plaintiffs of the need to present expert testimony.[7] Because our decision in Woodard I required plaintiffs to produce expert testimony to support their claims, we simultaneously granted plaintiffs’ cross-application for leave to appeal the Court of Appeals determination that their proposed expert was not qualified under MCL 600.2169.[8]
B. HAMILTON v KULIGOWSKI
Between 1992 and 1998, defendant Dr. Mark F. Kuligowski treated Rosalie Ackley for hypertension, diabetes, weight control, and a thyroid ailment. On March 19, 1998, Ackley, who was in her seventies, complained of numbness and weakness in her left arm. She further informed Kuligowski that she had been diagnosed with a blockage in her neck several years earlier. After detecting abnormal sounds in Ackley’s carotid artery during a physical examination, Kuligowski suspected that she had suffered a minor stroke and possibly suffered from bilateral carotid artery disease. Although he ordered a bilateral carotid Doppler echocardiography,[9] Kuligowski advised Ackley that *597 there was no cause for immediate concern. Three days later, Ackley suffered a stroke. She subsequently died in December 2000.
Plaintiff, Ackley’s daughter, filed the instant medical malpractice action on behalf of Ackley’s estate alleging that Kuligowski was negligent in failing to recognize Ackley’s prestroke symptoms and render appropriate treatment. Kuligowski is board-certified in internal medicine, and primarily sees geriatric patients. In support of her claims, plaintiff called as a witness a proposed expert who, like Kuligowski, is board-certified in internal medicine. Plaintiffs proposed expert spends half of his professional time in his office treating internal medicine and infectious disease patients and the other half in a hospital treating primarily infectious disease patients.
Kuligowski moved to strike plaintiffs proposed expert, arguing that he was not qualified under MCL 600.2169 to testify with regard to the appropriate standard of care because he specializes in infectious diseases while Kuligowski himself specializes in general internal medicine. The circuit court granted Kuligowski’s motion, ruling that plaintiffs proposed expert was not qualified under MCL 600.2169(l)(b) because he did not devote a majority of his time to the practice of general internal medicine but, instead, to the treatment of infectious diseases. Thereafter, the circuit court also granted Kuligowski’s motion for a directed verdict on the basis that plaintiff did not have a qualified expert to support her claims.
The Court of Appeals reversed the trial court’s ruling and held that plaintiffs proposed expert was qualified *598 under MCL 600.2169. The panel concluded that the treatment of infectious diseases was merely a “subspecialty” within the broader specialty of internal medicine, and that the statute does not require the matching of subspecialties. It further concluded that, because the treatment of infectious diseases is merely a branch of internal medicine with a narrower focus, plaintiffs proposed expert did, in fact, devote a majority of his time to the practice of internal medicine. The Court of Appeals therefore remanded the case for further proceedings.[10]
We granted Kuligowski’s application for leave to appeal.[11]
II. STANDARD OF REVIEW
These cases involve the interpretation of MCL 600.2169. We review questions of statutory interpretation de novo.[12] As always, our goal is to discern and give effect to the legislative intent that is expressed in the statutory language.[13] If the statutory language is unambiguous, then the Legislature’s intent is clear and we must enforce the statute as written.[14]
III. ANALYSIS
Before 1986, the question whether a plaintiffs proposed expert was qualified to testify with regard to the appropriate standard of care in a medical malpractice *599 case was governed by MRE 702.[15] This evidentiary rule provided trial courts with broad discretion to qualify proposed experts if they determined that scientific, technical, or other specialized knowledge was needed to assist the trier of fact in determining the appropriate standard of care the defendant doctor should have met and that the proposed expert was qualified to offer such testimony on the basis of the expert’s “ ‘knowledge, skill, experience, training, or education.’ ”[16]
However, as we discussed in McDougall v Schanz,[17] our Legislature ultimately deemed MRE 702 ineffective *600 in assuring that proposed experts presented reliable testimony in medical malpractice cases.[18] The primary deficiency with MRE 702 was that it failed to ensure that trial judges excluded proposed experts who were not actively involved in the medical field about which they sought to testify.[19] Therefore, in 1986 our Legislature enacted the first version of MCL 600.2169, which was designed to limit a trial court’s discretion to qualify experts in medical malpractice cases by systematically “precluding] certain witnesses from testifying solely on the basis of the witness’ lack of practice or teaching experience ... .”[20]
*601 Our Legislature further limited the discretion of trial judges to qualify proposed experts in 1993 when it enacted 1993 PA 78, which amended MCL 600.2169 to set forth even more restrictive criteria than the 1986 version.[21] In its current form, MCL 600.2169 now provides, in pertinent part:
(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
(i) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
(ii) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.[22]
*602 (3) This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.
Accordingly, these provisions set forth a number of specific, minimum criteria that a proposed expert must satisfy in order to testify regarding the appropriate standard of care in a medical malpractice case.[23] The first of these, of course, is that the proposed expert must be a licensed health professional.[24] The statute then goes on to set forth several additional requirements aimed at ensuring that the proposed expert possesses the same professional credentials as the defendant *603 doctor, thereby assuring that the proposed expert is familiar with the standards and techniques that should typically be followed by a physician in the defendant’s position. In particular, the statute requires that if the defendant doctor is a specialist, the proposed expert must also be a specialist in the same specialty. Further, if the defendant doctor is a board-certified specialist, the proposed expert must also be a board-certified specialist in the same specialty.[25]
Moreover, in addition to requiring that the proposed expert possess the same specialty qualifications as the defendant doctor, the statute, unlike MRE 702, also seeks to ensure that the proposed expert possesses actual, recent experience in that specialty area. It does this by requiring that the proposed expert have devoted a majority of his or her professional time during the year preceding the alleged malpractice to either the active clinical practice of the defendant’s specialty area or the instruction of that specialty area.[26]
Finally, the statute makes clear that the above requirements represent only the bare minimum that a proposed expert must meet in order to testify regarding the standard of care. It does this by explicitly granting a trial court the discretion to disqualify a proposed expert for other, unenumerated reasons;[27] for example, if the trial court determines that the proposed expert’s testimony is unreliable under MCL 600.2955[28] or the three factors recently added to MRE 702.
*604 A. "SPECIALIST” DEFINED
As is obvious from the above synopsis of the statute, the determination whether a proposed expert is minimally qualified to testify regarding the appropriate standard of care often turns on whether the defendant doctor qualifies as a specialist in a given area of medicine, thereby requiring the proposed expert to likewise qualify as a specialist in that area. MCL 600.2169, however, does not define the term “specialist.” It therefore falls upon us to accord a meaning to that term that best comports with the Legislature’s intent. In doing so, we are guided by two principles. The first is that MCL 600.2169 does not stand alone. Rather, “[i]t exists and must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the whole of the statute . . . .”[29] The second comes from the Legislature’s decree in MCL 8.3a that undefined words or phrases shall be given their common and ordinary meaning, but that technical words and phrases, and legal terms of art, are to be construed according to their peculiar and appropriate meaning.[30]
Applying the first of these principles, we first note that some indication regarding the meaning of the term *605 “specialist” can be gleaned from the relationship of MCL 600.2169 to MCL 600.2912d(l).[31] The latter statute, in conjunction with MCL 600.2169, requires the plaintiffs counsel to file an affidavit of merit with the complaint that is signed by a physician who counsel reasonably believes specializes in the same specialty as the defendant physician.[32] Accordingly, the Legislature intended for a plaintiff to be able to form a reasonable belief regarding whether a defendant doctor is a specialist at the commencement of the action — i.e., before the discovery process. Therefore, it is reasonable to conclude that the Legislature intended for the determination whether a defendant doctor is a specialist to correlate to how the defendant doctor subjectively represents himself or herself; in other words, whether the doctor holds himself or herself out as a specialist.
Further indication of what the Legislature intended when it used the term “specialist” can be gleaned from dictionary definitions. Because MCL 600.2169 uses the term “specialist” in the context of a medical specialist, it is a technical term that must be accorded its “peculiar and appropriate meaning” within the medical community. MCL 8.3a. Accordingly, it is necessary in this instance for us to refer to medical, rather than lay, dictionaries.[33]
*606 Some medical dictionaries base the determination whether a doctor is a specialist on how that doctor allocates time during practice; in other words, whether that doctor limits his or her practice primarily to a particular branch of medicine or surgery, or to a certain class of patients, organs, or diseases.[34] Other medical dictionaries, however, define a specialist not according to how the doctor allocates time, but rather according to whether the doctor has advanced training or knowledge in a specific branch of medicine or surgery, or a certain class of patients, organs, or diseases.[35]
*607 Thus, taking into consideration these technical definitions of the term “specialty,” as well as the meaning that can be ascribed to it from the relationship of MCL 600.2169 to MCL 600.2912d(l), we conclude that the Legislature intended the term “specialist” as used in MCL 600.2169 to denote a physician who holds himself or herself out as either (1) limiting his or her practice primarily to a particular branch of medicine or surgery, or to a certain class of patients, organs, or diseases, or (2) having advanced training or knowledge in a specific branch of medicine or surgery, or a certain class of patients, organs, or diseases.[36]
We note at this point that many areas of specialization contain narrower, more limited areas within them. For instance, a physician who specializes in pediatrics *608 can focus on general pediatric care, or can farther concentrate on the more limited fields of pediatric critical care or neonatal-perinatal care. Similarly, a physician who specializes in internal medicine can focus on general internal medicine or further concentrate his or her practice on any one of numerous, more limited fields such as cardiology, infectious diseases, gastroenterology, nephrology, and so forth. Plaintiffs maintain that the term “specialty” refers only to those areas of medicine that are recognized and designated as such by the American Board of Medical Specialties (ABMS) and the American Osteopathic Association (AOA). Under the ABMS/AOA framework, more generalized fields are termed “specialties” and more limited fields are termed “subspecialties.” Thus, plaintiffs argue that their proposed experts’ qualifications and the defendant doctors’ qualifications need only match at the broader, more generalized level. They assert that the narrower, more focused areas are not specialties but “subspecialties” under the ABMS/AOA framework and that the language of MCL 600.2169 does not contemplate subspecialties.
We reject this assertion. The plain language of MCL 600.2169(l)(a) is completely devoid of any indication that the Legislature intended that a physician’s “specialty” be circumscribed by the designations given by the ABMS and the AOA. Clearly, the unambiguous language of MCL 600.2169(l)(a) contemplates board-certified specialists as well as non-board-certified specialists. Because the statute permits a physician to be a “specialist” without board certification of any variety, there is no basis to conclude that the designations given by optional certifying organizations dictate a physician’s “specialist” status.[37] Moreover, permitting the *609 “specialty” designations given by the ABMS and the AOA to determine a physician’s specialty would render MCL 600.2169(l)(c) nugatory. Because both certifying boards award specialty certification in family medicine,[38] every general practitioner would be considered a “specialist” and subject to the expert witness requirements of MCL 600.2169(l)(a) instead of the expert witness requirements applicable to generalists under § 2169(l)(c).
Instead, we turn to the generally accepted technical meaning of the term “specialty,” which encompasses narrower, more focused areas of medical practice, qualifying them as specialties in and of themselves.[39] Thus, because the broader, more generalized areas and the narrower, more limited areas within them both constitute specialties under the accepted technical meaning of the word “specialty,” a plaintiffs proposed expert must match the defendant doctor’s qualifications at both levels.[40]
*610 B. “BOARD-CERTIFIED” DEFINED
Once it is determined that a defendant doctor qualifies as a specialist in a given area, the next inquiry is whether he or she also qualifies as a board-certified specialist in that area. Before defining what it means to be board-certified, however, one point bears emphasis. That is that the statute does not require the matching of board certifications in and of themselves. Rather, it only makes board certifications germane if the defendant doctor is a “specialist who is board certified.” Accordingly, the fact that a defendant doctor has obtained a board certification in a given area is irrelevant to the issue of credential matching unless the defendant doctor first qualifies as a specialist in that area.
Like with the term “specialty,” the Legislature did not define the phrase “board certified” in MCL 600.2169. Because of this, the plaintiffs in both these cases have argued that we should read MCL 600.2169 in pari materia with MCL 333.2701(a) of the Public Health Code, which defines “board certified” as “certified to practice in a particular medical specialty by a national board recognized by the American board of medical specialties [ABMS] or the American osteopathic association [AOA].” Accordingly, plaintiffs urge this Court to hold that a proposed expert need only match a defendant doctor’s board certification if that certification was issued by the ABMS or the AOA.
We decline to impute the definition of “board certified” from MCL 333.2701(a) to MCL 600.2169 for several reasons. First, the Legislature made clear that the definition of “board certified” set forth in MCL 333.2701(a) applies only to the Public Health Code by *611 prefacing it with the statement “As used in this part [of the Public Health Code]... ‘Board certified’ means ...(Emphasis added.) Especially in light of such clear words of limitation, we must presume that the Legislature intended that the definition of “board certified” set forth in MCL 333.2701(a) would not be applied to other statutes using the same phrase.[41] Second, statutes are only read in pari materia when they relate to the same subject or share a common purpose,[42] and not when, as here, their scope and aim are distinct and unconnected.[43] The Legislature’s purpose in enacting the Public Health Code was to protect the public health, safety, and welfare,[44] by regulating the persons, facilities, and agencies that affect them. Its purpose in enacting the Revised Judicature Act, of which MCL 600.2169 is a part, was to set forth the organization and jurisdiction of the judiciary and to effect procedural improvements in civil and criminal actions.[45] MCL 600.2169 fulfills this purpose by setting minimum requirements for proposed experts to ensure *612 that proof of medical malpractice “ ‘emanate[s] from sources of reliable character,’ ”[46] and is unrelated to protecting the health, safety, and welfare of the general public.
We thus fall back on the general rule set forth in MCL 8.3a that undefined, technical phrases are to be construed and understood according to their peculiar and appropriate meaning. We also keep in mind that if the Legislature had wanted to limit the definition of “board certified” in MCL 600.2169 only to certification by specific organizations it would have done so explicitly, as it did in MCL 333.2701(a).[47] Doing so, we adopt the definition of “board certified” set forth by the Appellate Division of the Supreme Court of New York,[48] which has defined that term as denoting “a credential bestowed by a national, independent medical board indicating proficiency in a medical specialty.”[49]
*613 As we did above with regard to the “specialty” versus “subspecialty” dispute, it is again necessary for us to resolve a question that arises in most cases as a result of nomenclature often used to distinguish between certifications offered for broad specialty areas and certifications offered for the narrower subspecialty areas. Specifically, certifications coinciding with the broader specialty areas are often referred to by parties and in case law as board certifications, while certifications coinciding with the narrower specialty areas are referred to as “certificates of special qualifications” or “certificates of added qualifications.” The result is that in many cases, such as Woodard, plaintiffs will argue that certificates of special qualifications are not board certifications that need to be matched. We clarify, however, that under the above definition of the phrase “board certified,” any difference between what are traditionally referred to as board certifications and what have commonly been called certificates of special qualifications is merely one of semantics. When a certificate of special qualifications is a credential bestowed by a national, independent medical board indicating proficiency in a medical specialty, it is itself a board certification that must be matched.
C. WHETHER ALL SPECIALTIES AND BOARD CERTIFICATIONS MUST BE MATCHED
Because many defendant doctors specialize in more than one area, or have become board-certified special *614 ists in more than one area, the question often arises whether MCL 600.2169 requires that a proposed plaintiffs expert match all the defendant doctor’s specialties and board certifications. In Tate v Detroit Receiving Hosp,[50] our Court of Appeals answered this question in the negative. Relying primarily on the statute’s mandate that a proposed expert must “ ‘specialize[] at the time of the occurrence that is the basis of the action ’ ” in the same specialty as the defendant doctor,[51] the Tate panel concluded that MCL 600.2169 “should be read so as to allow an expert to testify if that expert [specializes in or] is [a] board certified [specialist] in the same specialty being practiced by the [defendant] health professional at the time of the alleged malpractice.”[52] While we generally agree with the result reached by the Court of Appeals in Tate, we disavow its rationale.
The primary flaw with the Court of Appeals holding in Tate is that it bases its conclusion regarding what expert testimony is required on the language of MCL 600.2169. By its plain terms, however, MCL 600.2169 never requires a plaintiff to introduce expert testimony with regard to the standard of care. Instead, it merely states that if a plaintiff needs to introduce expert testimony to establish the appropriate standard of care, the expert introduced must meet the requirements set forth in the statute. Thus, the issue whether a plaintiff needs to introduce expert testimony at all, and, if so, whether the plaintiff needs to introduce expert testimony concerning the standard of care applicable to all the defendant doctor’s specialties and board certifications, depends not on MCL 600.2169, but on the spe *615 cialties and board certifications that are put into issue by the parties during the pleading and discovery process. To illustrate this point, we provide the following hypothetical examples:
1. Assume a plaintiff sues a doctor who has five specialties, but asserts in the complaint and accompanying affidavit of merit that the defendant doctor should have met the standard of care coinciding with only one of the defendant doctor’s specialties, and that the defendant doctor’s other four specialties are irrelevant to establishing and understanding that standard of care. Further assume that, in the answer, the defendant doctor admits that the plaintiff has asserted the appropriate standard of care, further admits that the challenged actions did not conform to it, and only contests the amount of damages.[53] In this situation, the plaintiff need not present expert testimony regarding the standard of care at trial. The plaintiff need only offer evidence regarding damages. MCL 600.2169 is thus inapplicable. The result would be the same in a case where a plaintiff is able to successfully avail himself or herself of the doctrine of res ipsa loquitur.
2. Assume again that the plaintiff sues a doctor who has five specialties, and again asserts in the complaint and accompanying affidavit that the defendant doctor should have met the standard of care coinciding with only one of the defendant doctor’s specialties, and that the defendant doctor’s other four specialties are irrelevant to establishing and understanding that standard of care. This time, the defendant doctor admits in the *616 answer and accompanying affidavit that the plaintiff has asserted the correct standard of care, but asserts that the challenged actions conformed to it. In this case, MCL 600.2169 applies because the plaintiff will need to introduce “expert testimony on the appropriate standard of practice or care” in order to prove that the defendant doctor’s actions did not conform to it. However, because the defendant doctor has conceded that only one of the five specialties is germane to the appropriate standard of care, the plaintiffs proposed expert only has to comply with the mandates of MCL 600.2169 with regard to that one specialty.
3. Assume again that the plaintiff sues a doctor who has five specialties, and again asserts in the complaint and accompanying affidavit that the defendant doctor should have met the standard of care coinciding with only one of the defendant doctor’s specialties, and that the defendant doctor’s other four specialties are irrelevant to establishing and understanding that standard of care. Assume this time that the defendant doctor, instead of admitting that the plaintiff has asserted the appropriate standard of care, asserts that the standard of care coinciding with one of the other specialties is the one the defendant should have met. In this situation, unless the plaintiff agrees with the defendant, the plaintiff will need to present expert testimony, concerning the standards of care applicable to two of the defendant doctor’s five specialties — the one that the plaintiff asserts is applicable and the one that the defendant asserts is applicable. No testimony regarding the standard of care for the defendant doctor’s other three specialties will be needed because the defendant has conceded that they do not apply.
*617 In this third hypothetical, the plaintiff will need to present two types of expert testimony: testimony to prove that the standard of care asserted by the defendant doctor does not apply, and testimony to establish the standard of care the plaintiff believes is applicable and how the defendant breached it. This, of course, raises the question whether MCL 600.2169 requires the plaintiff to produce one expert qualified to offer testimony in both areas. We hold that it does not; rather, it allows a plaintiff to produce multiple experts, each matching the defendant doctor’s credentials with regard to one specialty area, in order to fulfill the burden.[54] The reason is that MCL 600.2169(l)(b) requires a plaintiffs proposed expert to have devoted a majority of his or her professional time during the year immediately preceding the alleged malpractice to either the active clinical practice of, or the teaching of, the specialty about which the expert will testify. The statute does not impose a similar burden on the defendant doctor. Thus, while a defendant doctor can offer testimony regarding the appropriate standard of care for more than one specialty area, it would be impossible under the statute for a plaintiff to present one expert to likewise testify regarding the appropriate standard of care for more than one specialty area. It is a fundamental rule of statutory interpretation that statutes should be given a reasonable construction based on the legislative intent that can be inferred from their words.[55] A *618 construction of MCL 600.2169 that would render compliance impossible would not be reasonable.[56]
D. RESPONSE TO THE JUSTICE MARKMAN LEAD OPINION SIGNED BY JUSTICES CAVANAGH, KELLY, AND WEAVER, WHICH WE CONSIDER A DISSENT
The lead opinion’s interpretation of MCL 600.2169(1), as we understand it, is that it represents a legislative determination that in all cases only one of the defendant doctor’s specialties will be relevant to establishing the standard of care he or she should have met. Therefore, the justices in the lead opinion assert that the statute directs the trial court to determine, at the beginning stages of a lawsuit, exactly which specialty area the defendant doctor was practicing at the time of the alleged malpractice and to limit the expert testimony that may be presented to the jury only to testimony regarding the standard of care commensurate with that specialty area, or what the lead opinion terms the “relevant” specialty. However, the lead opinion’s interpretation is not grounded in the statutory language. Furthermore, its effect is to allow the trial court in the name of culling out the irrelevant to really exercise a power of theory preclusion with regard to both plaintiffs and defendants heretofore unknown in *619 our jurisprudence. In doing so, it will deny in given cases either a plaintiff or a defendant doctor his or her constitutional right to have a jury determine factual matters, weigh evidence, and assess credibility. This result will collide with the due process right under our Constitution of a party to present the theories it has as long as there is sufficient evidence to support each theory.
The biggest problem with the lead opinion’s interpretation of the statute is that it misunderstands completely the traditional roles played by the judge and jury in the trial process. Juries find facts so as to evaluate the theories of the parties. Judges, among other things, keep out evidence that is irrelevant to the proving of the theories. If the parties cannot produce evidence sufficient for a reasonable juror to decide the case on the basis of a certain theory, the jury is precluded by the judge from considering that theory. This preclusion however cannot come before proofs are presented or it is shown that there are no such facts by a properly pleaded motion for summary disposition or similar motion. A simple example to demonstrate this, albeit from another context, may be helpful. Let us assume that sometime after construction is completed a building collapses. In such a case, if the owner sues the architect on the theory of malpractice, the architect could defend by saying he or she was not the cause because he or she was not negligent but that the real cause was perhaps the negligence of the construction engineers, defectively manufactured materials, or even that there was an act of God, say, an earthquake. These alternative explanations, or theories, of how the building collapsed of course would either be factually supportable or not. If there was evidence to support them, they would be submitted to the jury for sorting out. This opportunity to support a party’s theory with *620 evidence cannot be precluded at the initiation stage of the lawsuit. It only can be done by a motion asserting that there is no genuine issue of material fact pursuant to MCR 2.116(0(10), or a similar type of pretrial motion, or at the close of a party’s proofs at trial where insufficient facts have been submitted. In no case, however, could the theories be described, as the lead opinion does, as relevant or irrelevant. The theories only give alternative views regarding how things happened. The words, relevant or irrelevant, can only apply to the supporting evidence for the theories. In any case, to complete the example, under the lead opinion’s thinking, in our hypothetical case a court could hold that the earthquake theory is irrelevant and preclude testimony on it immediately after the answer was filed and before there was any opportunity to even secure or present supporting facts.
The problem the hypothetical points out is the problem the lead opinion will create in medical malpractice cases also. For instance, if a doctor who specializes in cardiovascular surgery and nephrology[57] negligently inserts a pacemaker, the trial court should not be able to preclude either the plaintiff or the defendant from arguing that the defendant’s specialty in nephrology was or was not implicated by the procedure as long as the parties can produce reliable[58] expert testimony to *621 support their theories. If they do, they should be allowed to present their theories to the jury for it to make the factual determination of which specialty or specialties were implicated by the procedure. Yet, under the lead opinion’s approach, if the trial judge determines after the defendant’s answer is filed that one party’s theory regarding which specialty explains the standard of care is “irrelevant,” no proofs are allowed on it. Never, before today, has a theory in this or any other litigation of which we are aware been itself declared unpresentable without regard to the evidence to support it. What the lead opinion is doing is not a relevancy exercise. The only “relevancy” question for the trial court would be whether the proffered testimony has any tendency to make it more or less probable that the procedure the defendant doctor performed implicated one or more of his or her specialty areas. But this is not the decision the lead opinion wants the trial court to make. The lead opinion wants to let the trial court determine the factual question whether the pro *622 cedure performed by the defendant doctor did, in fact, implicate one or more of the doctor’s specialty areas. This is not a relevance question, no matter how adamant the lead opinion is in trying to characterize it as one. Rather, it is an exercise of explanatory theory preclusion.
By allowing such theory preclusion, the lead opinion’s analysis allows in a medical malpractice case the trial court, rather than the jury, to determine the factual issue of which specialty or specialties the defendant doctor was practicing at the time of the alleged malpractice. Ante at 558-560. This plainly disrupts the historical dynamic of our trial process, whereby factual determinations are to be made by the jury.
The historical division of functions between the court and the jury needs no citation of authority. It is the province of the jury to determine questions of fact and assess the credibility of witnesses.[59]
Not only will the lead opinion’s analysis take factual determinations out of the province of the jury, it will also foreclose the jury from assessing credibility and weighing evidence. A good example on the credibility issue can be seen in Woodard. Defendant Custer has argued throughout the proceedings in this case that the procedures he performed implicate the specialty of pediatric critical care. It is the case, however, that plaintiffs proffered expert, Anthony Casamassima, *623 M.D., who specializes in general pediatrics, testified in his deposition that he performed the same procedures on infants the same age as Austin Woodard during his residency.[60] On the basis of this testimony, plaintiffs have asserted that although such procedures were performed by a critical care specialist in this case, they do not necessarily implicate the specialty of critical care medicine. Under our analysis of the statute, if plaintiffs had presented their own critical care specialist meeting the criteria of MCL 600.2169(1) to support proffered expert Casamassima’s testimony that these procedures do not implicate the specialty of critical care, the testimony from all three doctors (Woodard, Casamassima, and plaintiffs critical care specialist) would be presented to the jury. The jury, after hearing this testimony, would evaluate the credibility of each doctor, determine how much weight should be given each doctor’s testimony, and make a factual determination regarding the theories so as to determine whether the procedures performed by defendant Custer do, in fact, implicate the specialty of pediatric critical care and the standard of care commensurate with it or, rather, merely implicate the specialty of general pediatrics and its commensurate standard of care. This is the jury’s traditional function.[61] The lead opinion, however, does *624 not even mention proffered expert Casamassima’s testimony. Instead, it concludes without discussing it that Custer was “practicing pediatric critical care medicine ....” Ante at 576.[62] How do they know? To say it was one or the other specialty is not a determination concerning relevance but a choice of which it was after considering evidence.[63]
Even more troubling at a less theoretical plane than the theory-preclusion role that the lead opinion gives to the trial court is how this will be practically implemented. There are puzzling questions to which the lead opinion provides no answers. For example, consider the following difficulties. In the case where there are mul *625 tiple specialties claimed, the trial court would have to have a hearing very soon after the defendant’s answer is filed so that the parties can get the decision by the judge of what the “relevant” specialty is so they can secure experts. Yet, at that point, there will be no depositions and probably not even reports, at least for the defendant doctor who just got sued. How is the trial judge to determine which specialties are “relevant” without expert testimony gained from depositions?[64] Moreover, reports, if there are any, are hearsay. How is that dealt with? Further, once the decision is made by the trial court, how does the loser proceed if that party, plaintiff or defendant or maybe even both, thinks the trial court got it wrong? Does he or she make an application for interlocutory leave to appeal in the Court of Appeals? Even if the Court of Appeals does grant the interlocutory leave to appeal, if the trial court’s decision is affirmed and this Court will not *626 review the case (which is very likely), does the loser then get to create a separate record in the trial court regarding his or her theory — the theory that the jury never heard?[65] If he or she is allowed a separate record (and how could he or she not be?), surely the opposing party will defend even on that separate record with their own experts. Where is the economy in this approach, which approach was, as advanced by the lead opinion, to stop the needless expense of having to secure “irrelevant” experts? Further, when the jury has heard only one theory regarding the standard of care and specialty at issue and an appeal of its decision is taken, is the earlier interlocutory holding (if there was one) res judicata? If it is not binding, or if there was no interlocutory appeal granted, how is the Court of Appeals, or eventually this Court, to analyze the factual dispute, at that stage or for that matter interlocutorily, with regard to the vying theories of “relevant specialties” and, thus, differing standards of care? Appellate courts will have no basis for a decision on that factual issue or issues. These conundrums all come from the fact that the justices in the lead opinion misunderstand what they are calling on judges to do.
At another level, constitutional rather than merely practical, the lead opinion’s theory-preclusion approach *627 denies a defendant doctor the right to procedural due process. This, of course, violates the United States Constitution and Michigan Constitution, which provide that no person (such as one being sued) shall be deprived of “life, liberty, or property, without due process of law.”[66] Said simply, this means that the Court must allow the defendant doctor an effective opportunity to defend the action, which entitles the defendant to confront adverse witnesses, to call his or her own witnesses, and to present evidence and arguments.[67]
But the lead opinion’s theory-preclusion analysis prevents a defendant doctor from arguing, and introducing evidence to prove, that more than one of his or her specialty areas is germane to establishing the appropriate standard of care. It also precludes the doctor from arguing that the plaintiffs proposed expert does not know what standard of care the defendant doctor should have followed because the proposed expert does not possess the same specialties and has not spent the requisite time practicing or teaching those specialties. Thus, the lead opinion’s interpretation of the statute allows the trial court to prevent the defendant from introducing evidence, making arguments, and cross-examining witnesses, i.e., presenting a defense.
Further, the lead opinion’s theory-preclusion analysis will also adversely affect plaintiffs. That is, the justices in the lead opinion appear to believe that it will always be defendants who assert that multiple specialties are germane to establishing the appropriate standard of care, perhaps as some sort of gaming tactic. See Ante at 568. We, however, do not believe that this will always be the case. For example, if a defendant doctor is *628 a specialist in two areas, a plaintiff may wish to argue that the combination of the defendant’s specialization in both areas imposes a higher standard of care on the defendant than the standards of care applicable to the individual areas. Under our interpretation of the statute, the plaintiff is allowed to argue to the jury that the higher standard of care applies, as long as he or she can produce experts who satisfy the criteria of MCL 600.2169(1) for both areas. Under the lead opinion’s interpretation of the statute, however, the plaintiff cannot present such an argument to the jury. Rather, the trial court would determine that only the standard of care applicable to one of the specialty areas is the “relevant” one, thereby precluding the plaintiff from arguing to the jury that the higher standard of care applies. Thus, the lead opinion’s interpretation of the statute will not only deny defendants the right to present a complete defense, but will also limit the theories that plaintiffs can present to the jury. Do the justices in the lead opinion believe that this is without possible constitutional implications?
All of these problems with the lead opinion’s analysis stem from the fact that the justices in the lead opinion repeat the same error made by the Court of Appeals in Tate. That is, they rely on MCL 600.2169(1) to answer the question of what expert testimony is needed. However, as we explained above, the statute was never intended to, and indeed does not, address that issue. Nowhere in MCL 600.2169(1) did the Legislature attempt to address whether a plaintiff needs to produce expert testimony with regard to a particular standard of care. Rather, as we explained in McDougall, the Legislature’s purpose in enacting MCL 600.2169 was to ensure that if a plaintiff needs to produce expert testimony regarding a particular standard of care, that *629 expert testimony “ ‘ emanate [s] from sources of reliable character .. .”[68]
In misinterpreting MCL 600.2169(1) as resolving the question whether expert testimony is needed with regard to a particular standard of care, the lead opinion first notes that the statute states that a proffered expert shall not testify regarding “the appropriate standard of practice or care” unless he or she satisfies the listed criteria. The lead opinion incorrectly construes this as a legislative determination that the plaintiff only has to produce expert testimony establishing the standard of care coinciding with what the lead opinion terms “the relevant” specialty area, i.e., the standard of care applicable to the specialty area that the defendant doctor was practicing at the time of the malpractice. We believe the lead opinion’s construction is erroneous because expert testimony regarding “the appropriate standard of practice or care” necessarily includes testimony about whether a particular procedure implicates a certain specialty area and, therefore, the standard of care applicable to that specialty area.[69] In other words, what the statute clearly says is that a proffered expert cannot testify with regard to what specialty area the defendant doctor was practicing and the standard of care commen *630 surate with that specialty unless the proposed expert meets the requirements of MCL 600.2169(1).
We also disagree with the lead opinion’s reliance on the use of terms such as “the same specialty,” “that specialty,” “a person,” and “the person” in MCL 600.2169(l)(a) for the proposition that a plaintiff need only present expert testimony regarding the standard of care applicable to one of the defendant doctor’s specialty areas. We agree with the lead opinion that these phrases are written in the singular. But our construction of the statute does not, as the lead opinion believes, require reading them in the plural. Said simply, the fact that the plaintiff may need to produce multiple experts concerning the applicability or nonapplicability of multiple standards of care does not change the fact that each proffered expert is “a person” who must match the defendant doctor’s qualifications with respect to “that specialty” that he or she is called to testify about.[70]
The sum of all of this is that the lead opinion’s interpretation of MCL 600.2169(1) does not follow from its plain language. It also allows the trial court to perform functions that are solely within the province of the jury, such as making credibility and factual determinations. Moreover, it effectively denies a defendant doctor his or her due process right to present a defense, and precludes plaintiffs from presenting supportable theories. We do not believe that such an interpretation of the statute is a reasonable one and we believe that it likely is an unconstitutional approach. Therefore, we cannot join it.
*631 E. ANALYSIS OF THE EFFECT OF JUSTICE MARKMAN’S HAVING SIGNED BOTH THE LEAD OPINION AND HIS CONCURRENCE
We find Justice Markman’s interpretation of the statute perplexing. He purports to concur in the lead opinion’s conclusion that MCL 600.2169(1) requires the trial court to choose one, and only one, specialty that is germane to establishing the appropriate standard of care and to preclude the parties from introducing expert testimony regarding other specialties claimed to be relevant. Inconsistently, he then argues in his concurrence that under MCL 600.2169(2) and (3) and MRE 702 the trial court may determine that more than one specialty is relevant and allow the parties to introduce expert testimony with regard to those other relevant specialties.[71] These positions are incompatible. Simply stated, the concurrence does not concur but disagrees. It should be a dissent. Because the concurrence, which must have been written after the lead opinion and thus is later in time, has been joined in part by the three justices signing this opinion, we believe it now becomes a de facto majority opinion.[72]
*632 IV APPLICATION
A. WOODARD v CUSTER
It is undisputed that defendant Custer holds himself out as limiting his practice primarily to, and having advanced training in, the fields of pediatric critical care and neonatal-perinatal medicine. He therefore qualifies as a specialist in both of those areas.[73] Further, under the definition we have set forth above, Custer qualifies as a board-certified specialist in both of these areas. Plaintiffs’ proposed expert, however, only qualifies as a board-certified expert in general pediatric care.
Throughout the proceedings in this case, Custer asserted that the specialty areas of pediatric critical care and neonatal-perinatal medicine were germane to establishing and understanding the standard of care that he should have followed when treating plaintiffs’ son in the Pediatric Intensive Care Unit. Plaintiffs, however, failed to present experts qualified to testify *633 that the specialties of pediatric critical care and neonatal-perinatal medicine were not relevant to establishing and understanding the standard of care that Custer should have met. Rather, their proposed expert was only qualified to testify regarding the standard of care coinciding with the specialty area they asserted was relevant, general pediatrics. Accordingly, because plaintiffs needed three expert witnesses and only presented one, they failed to present sufficient expert testimony to establish the appropriate standard of care. The trial court thus properly dismissed their lawsuit.
B. HAMILTON v KULIGOWSKI
Defendant Kuligowski holds himself out as limiting his practice primarily to, and having advanced training in, general internal medicine. He therefore qualifies as a specialist in that field.[74] Further, because it is undisputed that he has obtained board certification in general internal medicine, he qualifies as a board-certified specialist in that field.
Although he does not hold himself out as limiting his practice primarily to that field, plaintiffs proposed expert holds himself out as having advanced training or knowledge in general internal medicine. Further, he is board-certified in that field and therefore qualifies as a board-certified specialist in general internal medicine. Thus, were he only required to meet the requirements of MCL 600.2169(l)(a), plaintiffs proposed expert would be qualified to testify regarding the appropriate standard of care that Kuligowski should have met because plaintiffs proposed expert was a board- *634 certified specialist in the same specialty as Kuligowski at the time of the alleged malpractice.
Plaintiffs difficulties, however, stem from the fact that her proposed expert also qualifies as a specialist in the field of infectious diseases, and admittedly spent a majority of his professional time during the year preceding the alleged malpractice in the active clinical practice of infectious diseases rather than general internal medicine. Thus, plaintiffs proposed expert fails to meet the requirements of MCL 600.2169(l)(b). Accordingly, the trial court properly granted Kuligowski’s motion to strike plaintiffs proposed expert. Further, because the result was that plaintiff failed to present needed qualified expert testimony to support her lawsuit, the trial court correctly granted Kuligowski’s motion for a directed verdict.
V CONCLUSION
The trial courts in both these cases properly held that plaintiffs’ proposed experts were not qualified under MCL 600.2169 to testify regarding the appropriate standard of care that the defendant doctors should have met.
In Woodard, a majority of the Court of Appeals properly affirmed the trial court’s determination that plaintiffs’ proposed expert was not qualified. Thus, because plaintiffs failed to present expert testimony sufficient to support their claims, and because we have already held that the doctrine of res ipsa loquitur does not relieve plaintiffs of this burden,[75] we affirm the part of the judgment of the Court of Appeals that held that plaintiffs’ expert was not qualified and remand the case *635 to the circuit court for reinstatement of the circuit court’s order dismissing plaintiffs’ claim with prejudice.
In Hamilton, the Court of Appeals improperly reversed the judgment of the circuit court and held that plaintiffs proposed expert was qualified under MCL 600.2169. We therefore reverse the judgment of the Court of Appeals and remand the case to the circuit court for reinstatement of the circuit court’s order granting a directed verdict to defendant Kuligowski.
Corrigan and Young, JJ., concurred with Taylor, C.J.

 We do not, however, agree with his conclusion that the trial court, rather than the parties themselves or the jury, is to determine which specialties are germane. We also do not join in his appendix, because much of its discussion is obiter dictum.

 The lead opinion asserts that it has four votes, apparently believing that stating it makes it so. However, as we have pointed out, the inconsistencies between Justice Makkman’s concurrence and his lead opinion evince that the lead opinion does not, in fact, carry four votes. *593 Further evidence that Justice Markman’s concurrence is not in harmony with the lead opinion is that he had to file it because none of the other justices signing his lead opinion agree with his position.

 Unpublished opinion per curiam of the Court of Appeals and separate unpublished opinion concurring in part and dissenting in part by Meter, J., issued October 21, 2003 (Docket Nos. 239868, 239869). A separate majority, however, determined that the doctrine of res ipsa loquitur applied to obviate plaintiffs’ need to present expert testimony. Unpublished opinion concurring in part and dissenting in part by Meter, J., and unpublished dissenting opinion by Borrello, J. We have previously reversed that portion of the Court of Appeals holding in Woodard, v Custer, 473 Mich 1; 702 NW2d 522 (2005) (Woodard I).

 261 Mich App 608; 684 NW2d 366 (2004).

5 Unpublished opinion per curiam of the Court of Appeals and separate opinion concurring in part and dissenting in part by Meter, J., and separate dissenting opinion by Borrello, J., decided October 21, 2003 (Docket Nos. 239868, 239869).

6 471 Mich 890 (2004).

 Woodard I, supra, 473 Mich at 9-10.

 473 Mich 856 (2005).

 A “Doppler echocardiography” is an “ultrasound used to measure cardiovascular blood flow velocity for diagnostic purposes (as for evalu *597 ating valve function).” Merriam Webster’s Medline Plus, <http://www2.merrriam-webster.com/cgi-bin/mwmednlm> (accessed January 9, 2006).

 261 Mich App 608; 684 NW2d 366 (2004).

 473 Mich 858 (2005).

 Grossman v Brown, 470 Mich 593, 598; 685 NW2d 198 (2004).

 Halloran v Bhan, 470 Mich 572, 576; 683 NW2d 129 (2004).

 Mayor of Lansing v Pub Service Comm, 470 Mich 154, 157; 680 NW2d 840 (2004).

 At the time the first version of MCL 600.2169 was enacted in 1986, MRE 702 provided:
If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
A recent amendment of MRE 702, which became effective on January 1, 2004, further limits a trial court’s discretion to qualify a proposed expert by adding that the court may only admit the expert’s testimony if:
(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of rehable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
As stated in the staff comments that follow MRE 702, the purpose of this amendment was to emphasize the trial court’s role as gatekeeper to exclude expert testimony that is unreliable because it is based on unproven theories or methodologies in conformance with Daubert v Merrell Dow Pharmaceuticals, Inc, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and Kumho Tire Co, Ltd v Carmichael, 526 US 137; 119 S Ct 1167; 143 L Ed 2d 238 (1999).

 See McDougall v Schanz, 461 Mich 15, 25; 597 NW2d 148 (1999), quoting MRE 702.

 Id.

 Id. at 25, 36.

 McDougall, supra, 461 Mich at 25 n 9, quoting the dissenting Court of Appeals judge’s opinion in McDougall, 218 Mich App 501, 509 n 1; 554 NW2d 56 (1996) (Taylor, EJ., dissenting), quoting the Report of the Senate Select Committee on Civil Justice Reform, issued September 26, 1995:
“As a practical matter, in many courts merely a license to practice medicine is needed to become a medical expert on an issue.
“This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These ‘hired guns’ advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. There is a perception that these so-called expert witnesses will testify to whatever someone pays them to testify about.
“This proposal is designed to make sure that expert witnesses actually practice or teach medicine. In other words, to make sure that experts mil have firsthand practical expertise in the subject matter about which they are testifying. In particular, wdth the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses actually practice in the same speciality. This will protect the integrity of our judicial system by requiring real experts instead of ‘hired guns.’ ”

 McDougall, supra, 461 Mich at 24-25.

 McDougall, supra, 461 Mich at 21 n 2.

22 Like MCL 600.2169(l)(a) and (b), which set forth the minimum criteria for proposed experts who will testify regarding the standard of *602 care that a specialist should have followed, MCL 600.2169(l)(c) sets forth criteria for cases involving general practitioners. Because both these cases involve specialists, however, MCL 600.2169(l)(c) is not germane to our decision. Additionally, MCL 600.2169(2) sets forth specific criteria that a trial court must consider when determining whether any proposed expert in a medical malpractice case — not just those offered to testify regarding the appropriate standard of care, but such matters as causation, and so forth — is qualified to testify. Halloran, supra, 470 Mich at 578 n 6. However, because both proposed experts in these cases sought to testify with regard to the appropriate standard of care, their qualification is governed by the more specific requirements of MCL 600.2169(1). Id. Therefore, MCL 600.2169(2) is also not relevant to our decision in these cases.

 We agree with the lead opinion that, although we refer to MCL 600.2169(1) throughout this opinion as imposing requirements on proposed plaintiffs experts, the statute applies equally to standard of care experts offered by the defendant because it applies to standard of care testimony offered “against” and on “behalf” of the defendant doctor. The lead opinion seems to think we disagree with this, ante at 560 n 5, but that is not the case. Instead, what we point out later in this opinion is that, contrary to the lead opinion’s apparent belief, it will not always be defendants that assert that multiple specialties are germane to establishing the standard of care that the defendant doctor should have exercised. Rather, we believe there will be circumstances in which plaintiffs will also assert that more than one of the defendant doctor’s specialty areas are germane to understanding the standard of care the defendant doctor should have exercised.

 MCL 600.2169(1).

 MCL 600.2169(l)(a).

 MCL 600.2169(l)(b).

 MCL 600.2169(3).

 MCL 600.2955 requires a trial court to determine whether a scientific opinion rendered by an otherwise qualified expert is rehable by assessing, among other things, whether the opinion and its basis have been subjected to testing and peer review publication. MCL 600.2955(3) *604 specifically provides that the provisions of MCL 600.2955 are in addition to the criteria for expert testimony in medical malpractice actions provided in MCL 600.2169.

 Arrowhead Dev Co v Livingston Co Rd Comm, 413 Mich 505, 516; 322 NW2d 702 (1982).

 MCL 8.3a provides:
All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

 MCL 600.2912d(l) provides in relevant part:
[T]he plaintiff in an action alleging medical malpractice or, if the plaintiff is represented by an attorney, the plaintiffs attorney shall file with the complaint an affidavit of merit signed by a health professional who the plaintiffs attorney reasonably believes meets the requirements for an expert witness under section 2169.

 Grossman, supra, 470 Mich at 596.

 We realize that in Cox v Flint Bd of Hosp Managers, 467 Mich 1, 18-19; 651 NW2d 356 (2002), quoting Random House Webster’s College *606 Dictionary (1997), this Court defined the term “specialist” as “ ‘a medical practitioner who deals only with a particular class of diseases, conditions, patients, etc.’ ” There, we listed several medical terms with their definitions as a reference for the issue under discussion in that case: the scope of a nurse’s responsibilities. Id. Accordingly, we are not bound by this dictum, particularly where we resolved that case on another ground.

 See Dorland’s Illustrated Medical Dictionary (28th ed), defining a “specialist” as “a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice.” Accord Gould Medical Dictionary (3d ed), which similarly defines a “specialist” as “[a] physician or surgeon who limits his practice to certain diseases, or to the diseases of a single organ or class, or to a certain type of therapy. . . .” See also Stedman’s Medical Dictionary (26th ed), defining a “specialist” as “[o]ne who devotes professional attention to a particular specialty or subject area,” and a “specialty” as “[t]he particular subject area or branch of medical science to which one devotes professional attention.”

 See Taber’s Cyclopedic Medical Dictionary (18th ed), which defines “specialist” as
[a] dentist, nurse, physician, or other health professional who has advanced education and training in one clinical area of practice such as internal medicine, pediatrics, surgery, ophthalmology, neurology, maternal and child health, or cardiology. In most specialized areas of health care, there are organizations offering qualifying examinations. When an individual meets all of the criteria of such a board, he or she is called “board certified” in that area.
*607 See also Mosby’s Medical Dictionary (6th ed), which defines “specialist” as “a health care professional who practices a specialty.” It then defines “specialty” as
a branch of medicine or nursing in which the professional is specially qualified to practice by having attended an advanced program of study, by having passed an examination given by an organization of the members of the specialty, or by having gained experience through extensive practice in the specialty.

 In their briefs filed in this Court, the plaintiffs in both Woodard and Hamilton, as well as several of their amici, have argued emphatically that a “specialty” area must be defined as being synonymous with the areas of medicine in which a doctor can obtain board certification from either the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA). In support of this argument, they rely on the Legislature’s mandate in MCL 600.2169(l)(a) that if the defendant doctor is a board-certified specialist, the proposed expert witness “must be a specialist who is board certified in that specialty.” (Emphasis added.) We disagree. Although this language indicates that specialty areas can overlap with areas in which a doctor can obtain board certification, it in no way limits the definition of specialty to only those areas. Moreover, the above definitions of the term “specialist” from Taber’s and Dorland’s make clear that the areas of medicine in which a doctor can specialize are not limited only to those in which a doctor can obtain board certification.

 As amicus ABMS acknowledges in its brief, a physician need not be certified in a particular area of medicine in order to practice it. Thus, *609 certifying organizations such as the ABMS do not control a physician’s practice area. Such organizations develop and administer various benchmarks of competency for those physicians who voluntarily elect to he certified in their chosen areas of specialty.

 The American Board of Family Medicine is a member board of the ABMS. See <https://www.theabfin.org> (accessed April 20, 2006). The American Osteopathic Board of Family Physicians is a member board of the AOA. See <http://www.aobfp.org/home.html> (accessed April 20, 2006).

 Our construction of the term “specialty” as also encompassing so-called “subspecialties” is consistent with the technical meaning of the term “subspecialty,” which is defined as “a subordinate field of specialization.” Merriam Webster’s Medline Plus, <http://www2.merriam-webster.com/cgibin/mwmednhn?book=Medical&va’subspecialfy> (accessed January 9, 2006).

 An example of a case where a plaintiffs proposed expert did not match the defendant doctor’s qualifications at both levels can be seen in our recent decision in Halloran v Bhan, 470 Mich 572; 683 NW2d 129 (2004). In Halloran, we held that the plaintiffs proposed expert failed to *610 meet the requirements of MCL 600.2169 because, although he arguably matched the defendant doctor’s credentials at the subspecialty level, he failed to match them at the broader specialty level. Id.

 See Grimes v Dep’t of Transportation, 475 Mich 72, 85; 715 NW2d 275 (2006); see also Farrington v Total Petroleum, Inc, 442 Mich 201, 210; 501 NW2d 76 (1993) (“Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there.”); Detroit v Redford Twp, 253 Mich 453, 456; 235 NW 217 (1931) (“Courts cannot attach provisions not found therein to an act of the legislature because they have been incorporated in other similar acts.”), citing Michigan v Sparrow, 89 Mich 263, 269; 50 NW 1088 (1891).

 Detroit v Michigan Bell Tel Co, 374 Mich 543, 558; 132 NW2d 660 (1965).

 Beznos v Dep’t of Treasury (On Remand), 224 Mich App 717, 722; 569 NW2d 908 (1997).

 MCL 333.1111(2).

 See Connelly v Paul Ruddy’s Equip Repair & Service Co, 388 Mich 146, 151; 200 NW2d 70 (1972) (“The purpose of the Act was to effect procedural improvements, not advance social, industrial or commercial policy in substantive areas.”).

 McDougall, supra, 461 Mich at 36, quoting McDougall, supra, 218 Mich App at 518 (Taylor, EJ., dissenting).

 A further indication that the Legislature intended to limit the phrase “board certified” to certification by either the ABMS or the AOA only for the purposes of the Public Health Code is that it did not limit the phrase in either of the other two instances it has defined it. Specifically, in both MCL 500.2212a(4) of the Insurance Code and MCL 550.1402a(4) of the Nonprofit Health Care Corporation Reform Act, the Legislature defined “board certified” as certification by the ABMS or another “national health professional organization.”

 The state of New York calls its equivalent to Michigan’s circuit court (i.e., the trial court of general jurisdiction) the Supreme Court. The Appellate Division of the Supreme Court of New York is the equivalent of the Michigan Court of Appeals.

 Rosenblum v New York State Workers’ Compensation Bd, 309 AD2d 120, 123; 764 NYS2d 82 (2003). This definition is consistent with how medical dictionaries define the phrase. See Taber’s Cyclopedic Medical Dictionary (18th ed), defining “board certification,” in part, as “a process that ensures that an individual has met standards beyond those of admission to licensure and has passed specialty examinations in the field.”
*613 The justices in the lead opinion state that they find it “befuddling” that we have adopted the definition of “board certified” from Rosenblum without further explanation. However, we have explained, we believe, that we adopted the definition from Rosenblum because it is consistent with the technical, medical definition of the term as required by MCL 8.3a and, simultaneously, is consistent with our Legislature’s intention that the phrase “board certified” not be limited only to credentials bestowed by certain national organizations.

 249 Mich App 212; 642 NW2d 346 (2002).

 Id. at 218, quoting MCL 600.2169(l)(a) (emphasis added).

 Id. at 215 (emphasis in Tate).

 Although we refer only to the defendant doctor’s answer and affidavit of meritorious defense in these hypothetical examples, the parties can, of course, further refine which specialties and board certifications are at issue through subsequent discovery techniques such as depositions, requests for admissions, written interrogatories, and so forth.

 We further note that this holding necessarily applies also to MCL 600.2912d(l). Thus, a plaintiff can, and in many cases will need to, utilize multiple experts at the affidavit of merit stage who the plaintiff reasonably believes collectively match all the defendant doctor’s specialties.

 Rakestraw v Gen Dynamics Land Systems, Inc, 469 Mich 220, 224; 666 NW2d 199 (2003) (“In interpreting a statute, our obligation is to discern the legislative intent that may reasonably be inferred from the *618 words actually used in the statute.”); see also Massey v Mandell, 462 Mich 375, 379-380; 614 NW2d 70 (2000).

 West v Northern Tree Co, 365 Mich 402, 406; 112 NW2d 423 (1961) (“The law should not be read to require the impossible.”). The rule that a statute should not be construed as requiring the impossible is commonly referred to as the doctrine of lex non intendit aliquid impossible, which means that “[t]he law does not intend anything impossible. For otherwise the law should not be of any effect.” Black’s Law Dictionary (6th ed). It is based on the presumption that the Legislature intended for the laws it enacts to be effective, rather than rendered ineffective by a construction requiring a condition that is physically impossible to perform. Chew Heong v United States, 112 US 536, 554-555; 5 S Ct 255; 28 L Ed 770 (1884).

 Nephrology is a medical specialty involving the kidneys. Merriam Webster’s Medline Plus, <http://www2.merriam-webster.com/cgibin/mwmednlm?book= Medical&va=nephrology> (accessed April 20, 2006).

 As we outlined at the beginning of the analysis section, the requirements set fort in MCL 600.2169(1) are only minimum requirements. The reliability requirements of MCL 600.2955 and MRE 702 must also be considered. Thus, in order to present expert testimony that a particular specialty area is germane to establishing the appropriate standard of care, a party not only needs to establish that its proposed expert meets the credential and experience requirements of MCL 600.2169(1), but also *621 that the expert’s opinion is based on proven theories and methodologies, i.e., that it is not based on “junk science.” Gilbert v DaimlerChrysler Corp, 470 Mich 749, 779-783; 685 NW2d 391 (2004); see also MCL 600.2955; Craig v Oakwood Hosp, 471 Mich 67, 78-80; 684 NW2d 296 (2004). The lead opinion appears to overlook this fact and, thus, seems to think that under our analysis parties, particularly defendants, will be able to assert that any specialty is germane to establishing the standard of care.
The lead opinion responds to this by asserting that we are “confusing relevancy and reliability.” Ante at 568 n 14. That is not the case. What we are stating is that a party must present rehable expert testimony to prove that a specialty area is germane to establishing the standard of care. The lead opinion dismisses this by asking why a party should have to introduce evidence concerning an irrelevant specialty. We would ask in response how exactly it is that a specialty area can be dismissed as irrelevant when rehable expert testimony has been presented that it was implicated by the procedure performed and, thus, is germane to understanding the standard of care the defendant doctor should have exercised.

 People v Lemmon, 456 Mich 625, 636-637; 576 NW2d 129 (1998); see also Page v Stanley, 242 Mich 326, 330; 218 NW 673 (1928). That factual determinations are solely within the province of the jury is not only a matter of historical happenstance, it is also guaranteed by the Michigan Constitution. Specifically, Const 1963, art 1, § 14 provides that, when demanded, the defendant has a right to a jury trial. As we recently explained in Phillips v Mirac, Inc, 470 Mich 415, 426; 685 NW2d 174 (2004), this includes the right to have questions of fact decided by the jury.

 The following colloquy took place during Dr. Casamassima’s deposition:
Q. When is the last time you inserted a central venous line in a patient as old as Austin Woodard?
A. During my residency.
Q. Same question with regard to the arterial line.
A. During my residency.

 Lemmon, supra; see also Alley v Klotz, 320 Mich 521, 532; 31 NW2d 816 (1948).

 The lead opinion attempts to support its conclusion that these procedures implicate the specialty of critical care medicine by stating that Custer performed them in the PICU while the infant patient was critically ill. The fact that a particular procedure is performed in a PICU on a critically ill patient, however, does not necessarily mean that that particular procedure implicates the specialty of critical care medicine. As an example, the mere fact that a critical care specialist practicing in a PICU inserts an IV into the arm of a critically ill patient does not in and of itself make the insertion of IVs a procedure implicating the doctor’s specialty in critical care medicine.

 The lead opinion claims that it knows Custer was practicing pediatric critical care medicine “because all of the admissible evidence supports the trial court’s finding that the defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice.” Ante at 576 n 19. That is not the case because Cassamassima’s testimony was admissible to prove that he, a specialist in general pediatric care, performed such procedures during his residency. From this testimony, and the context in which it was elicited, the jury could reasonably infer that it is relatively common for doctors who practice only general pediatric care to perform the procedures in this case and that a specialty in pediatric critical care is not required to understand the standard of care that should have been followed. The lead opinion, however, simply concludes without considering this testimony that these procedures require a specialty in pediatric critical care to perform and then, on the basis of that conclusion, asserts that Cassamassima’s testimony is not admissible because it was not offered by a specialist in pediatric critical care.

 The justices in the lead opinion seem to believe that the trial court •will simply be able to determine at the beginning stages of trial, without expert testimony, whether a particular procedure implicates a particular specialty. We find this curious given this Court’s historical recognition that expert testimony is almost always needed to establish the standard of care in medical malpractice actions because it is something that is not within the common purview of jurors or the court. Woodard I, supra, 473 Mich at 6; Bryant v Oakpointe Villa Nursing Centre, Inc, 471 Mich 411, 422-423; 684 NW2d 864 (2004). The justices in the lead opinion respond by asserting that expert testimony probably will not be required in most cases. However, contrary to the lead opinion’s belief, most cases probably will not be as simple as choosing between cardiovascular surgery and podiatry because most defendant doctors’ specialties will be closely related. The lead opinion also accuses us of “ignoring the distinction between determining which specialty is relevant and determining the appropriate standard of care,” ante at 569 n 15, and asserts that expert testimony will only be needed to determine the standard of care, not the specialty or specialty areas implicated by a procedure. How, exactly, will a trial judge with no medical training determine whether a particular procedure implicates such interrelated specialties as pediatric critical care medicine or neonatal-perinatal care medicine, or both.

 Strangely, the lead opinion asserts that a separate record will not be necessary because all the defendant doctor will have to do to preserve the issue is object on the ground that the plaintiffs expert does not specialize in the “relevant” specialty. Ante at 574-575. The lead opinion misses the point. The issue on appeal will not be whether the proposed expert specializes in the specialty area the trial court determined was the “relevant” one. Rather, the issue will be whether the trial court chose the correct specialty as the “relevant” one. There will be no way for an appellate court to assess that determination without a record being made containing expert testimony regarding which specialty areas were implicated by the procedure the defendant doctor performed, just as there is no way for a trial court to make the determination in the first instance without such a record.

 US Const, Am Xiy §1; Const 1963, art 1, § 17.

 Bundo v Walled Lake, 395 Mich 679, 696; 238 NW2d 154 (1976).

 McDougall, supra (Taylor, EJ., dissenting), 461 Mich at 36, quoting McDougall, 218 Mich App at 518.

 The word “appropriate,” which can he defined by reference to an ordinary dictionary because it is a common, rather than technical, term, means “[s]uitable for a particular person, condition, occasion, or place; proper; fitting.” The American Heritage Dictionary: Second College Edition (1982). We would also note that even if the statute used the term “relevant,” as the lead opinion does, it still would encompass testimony regarding whether a particular procedure implicates a certain specialty area and, therefore, the standard of care applicable to that specialty area. This is because the word “relevant” means “[r]elated to the matter at hand; pertinent.” Id.

 Contrary to Justice Markman’s assertion in his concurrence, this explains why our decision here is not inconsistent with this Court’s holdings in Robinson v Detroit, 462 Mich 439, 462; 613 NW2d 307 (2000), or Paige v City of Sterling Hts, 476 Mich 495; 720 NW2d 219 (2006).

 Furthermore, the lead opinion concludes that because there can only be one relevant specialty, plaintiffs are only required to produce one expert. But, Justice Markman agrees with both the lead opinion and this opinion that the practice and teaching requirements in MCL 600.2169(l)(b) preclude any proffered expert from being able to testify about more than one specialty area. Thus, because he states in his concurrence that plaintiffs can be obligated to produce expert testimony regarding more than one specialty area, it logically follows that plaintiffs must he able to utilize more than one expert, just as we have concluded in this opinion. Justice Markman does not concede this in his concurrence, but it is a necessary conclusion in order for his analysis to work.

 In his response to this opinion, Justice Markman adamantly asserts that his concurrence is consistent with the lead opinion. In doing so, he states, “While the majority opinion holds that under § 2169(1) only the one most relevant specialty must match, this does not mean that a different provision of law cannot require that other relevant specialties be matched.” Ante at 583. Justice Markman apparently does not see the *632 inconsistency in arguing that there can only be one relevant specialty and, at the same time, arguing that there can be more than one. He also apparently does not realize that his argument that “different provision[s] of law” require more than one specialty to match defeats the lead opinion’s argument that MCL 600.2169(1) mandates that there can be only one “relevant” specialty and, in the process, renders nugatory every word and clause of MCL 600.2169(1) that the lead opinion relies on for the conclusion that there can be only one “relevant” specialty. Furthermore, Justice Markman fails to explain how it is reasonable to interpret MCL 600.2169(1) as mandating that there be only one relevant specialty but, simultaneously, saying that experts proffered to testify about other specialty areas must meet the requirements of MCL 600.2169(1). Justice Markman states that our opinion “sows confusion,” Ante at 554 n 1; Ante at 586, but we believe that it is his position that sows confusion.

 Although defendant Custer is board-certified in general pediatrics, he only holds himself out as a specialist in pediatric critical care and neonatal-perinatal medicine as the director of pediatric critical care medicine for the PICU. He therefore does not qualify as a specialist in general pediatrics.

 Although he testified that he mainly sees geriatric patients, Kuligowski does not hold himself out as limiting his practice to, or having advanced knowledge in, the treatment of geriatric patients and, therefore, does not also qualify as a specialist in geriatric internal medicine.

 Woodard I, supra, 473 Mich at 9-10.